1    ADAM B. WOLF (215914)
     TRACEY COWAN (250053)
2    WOLF LEGAL, P.C.
     4 Embarcadero Center, Suite 1400
3    San Francisco, CA  94111
     Telephone: (415) 766-3545
4    Facsimile: (415) 402-0058
     awolf@wolflegal.com
5    tcowan@wolflegal.com

6
     CHRISTOPHER D. SULLIVAN (148083)
7    MATTHEW R. SCHULTZ (220641)
     GREENFIELD SULLIVAN DRAA
8    & HARRINGTON LLP
     150 California Street, Suite 2200
9    San Francisco, CA  94111
     Telephone: (415) 283-1776
10   csullivan@greenfieldsullivan.com
     mschultz@greenfieldsulivan.com
11

12
     Attorneys for Plaintiffs Bradshaw et al.
13

14
                    UNITED STATES DISTRICT COURT
15                  NORTHERN DISTRICT OF CALIFORNIA

16   ANDREW BRADSHAW, TANIF              Civil Case No. 3:12-CV-06376-JSW
     STEPHENSON, ADAM CORRIVEAU,
17   and JESELL GONZALES, on behalf of   **SECOND AMENDED COMPLAINT FOR
     themselves and similarly situated   EQUITABLE, DECLARATORY AND
18   individuals,                        INJUNCTIVE RELIEF AND DAMAGES
                                         FOR:**
19            Plaintiffs,
                                              1.  **FRAUDULENT CONCEALMENT**
20        v.                                  2.  **MISTAKE OF FACT**
                                              3.  **UNJUST ENRICHMENT**
21                                            4.  **VIOLATIONS OF THE
     SLM CORPORATION, a Delaware                  CALIFORNIA UNFAIR
22   corporation; and SALLIE MAE, INC., a        COMPETITION LAW**
     Delaware corporation,                    5.  **VIOLATIONS OF THE
23                                                OKLAHOMA CONSUMER
              Defendants.                          PROTECTION ACT**
24                                            6.  **NEGLIGENCE**

25
                                         **CLASS ACTION**
26
                                         **DEMAND FOR JURY TRIAL**
27

28

12330

**INTRODUCTION**

1.     This lawsuit is the result of Sallie Mae's wrongful student loan lending practices that were part of a deliberate enterprise and fraudulent scheme targeting California's poorest and most vulnerable students and their families. While this scheme resulted in Sallie Mae reaping huge profits with its partners, California Culinary Academy ("CCA") and Career Education Corporation ("CEC") (CCA's parent company), it left Plaintiffs and the Proposed Class with shattered lives and ruined finances. Plaintiffs desperately need relief from Sallie Mae's high-interest private education loans ("High-Interest Private Loans"). This lawsuit will provide that relief. Plaintiffs have suffered enough.

2.     The Plaintiffs in this lawsuit are former students of CCA who were misled into enrolling in CCA's programs and taking out High-Interest Private Loan with CCA's "Preferred Lender," Sallie Mae, believing it was a good financial move that would allow them to receive a useful education and obtain post-graduation employment that would allow them to re-pay the loans. Salle Mae failed to disclose key facts that it knew about CCA, the High-Interest Private Loans, and the real risks to plaintiffs from taking out the High-Interest Private Loans to attend CCA.

3.     Plaintiffs had no idea that attending CCA was an economically irrational act. Plaintiffs did not know that a CCA education has little or no value. Nor did they understand that at no relevant time has there been a job market for CCA graduates that pays sufficient wages to enable graduates to pay down the substantial debt they must incur to finance CCA's exorbitant tuition.

4.     This lawsuit focuses on Sallie Mae's involvement in this fraudulent enterprise. Sallie Mae's role in this scheme is similar to that of a doctor serving poison to customers who believed they were taking medicine. At the time the Plaintiffs entered into the High-Interest Private Loans, Sallie Mae had secretly "relaxed" its criteria for what schools and students it would work with, as part of a "high volume" strategy designed to issue student loans to as many students at as many schools as possible. As Sallie Mae's then-CEO, Thomas Fitzpatrick, stated at an internal executive meeting in early 2007, "If the borrower can create condensation on a mirror, they

12330

need to get a loan this year."

5.      To achieve this goal, Sallie Mae made an agreement with CCA and its parent, CEC: Sallie Mae would act as CCA's "preferred lender."  Under this financial arrangement, CCA and CEC agreed to "steer" its prospective students to use Sallie Mae as the lender for CCA's exorbitantly high tuition and costs.

6.      The way that it typically worked was simple:  a prospective student at CCA would be fraudulently induced to enroll in CCA's worthless programs, based in part on assurances from CCA representative that they had "already qualified" for a loan with Sallie Mae for the entirety of CCA's tuition and fees.  As part of the process of being fraudulently induced to enroll, the students would be directed to CCA's "financial aid" sale persons, who would inform the student that Sallie Mae was the "preferred lender" for CCA students and that they could easily obtain a loan for the full amount of the tuition.  CCA, working with Sallie Mae, would then quickly provide the student with Promissory Notes and other documentation that Sallie Mae had prepared and provided to CCA for the student to sign with both CCA and Sallie Mae's name on them.

7.      Well after Plaintiffs signed their promissory notes, Sallie Mae essentially admitted that at the time it was giving these loans to Plaintiffs and other CCA students, Sallie Mae was both aware of CCA's fraudulent recruitment practices and the key facts hidden from CCA students that made these loans, in Sallie Mae's Chairman's own words, "predictably not collectable."

8.      For years, Sallie Mae touted its close working relationship with its "partner" schools like CCA.  As Sallie Mae explained in its 2008 10-K, "[o]ur sales force is the largest in the student loan industry.  The core of our marketing strategy is to generate student loan originations by promoting our brands on campus through the financial aid office."  (2008 10K at 2.)

9.      Sallie Mae, at the time, was openly relying on CCA's well-documented fraudulent recruitment practices.  As it admitted in its 2008 10-K, "[o]ur primary marketing point-of-contact is the school's financial aid office."  (*Id.* at 7.)  In fact, Sallie Mae made it a policy and practice to work on a daily basis with recruiters at schools such as CCA.  As Sallie Mae stated in its 2006 10-K:  "Our primary marketing point-of-contact is the school's financial aid office . . . . Our sales force . . . **works with financial aid administrators on a daily basis** . . . ."  (2006 10-K at 12.)

12330

10. While working on a "daily basis" with its "partner" schools to "market" high-interest student loans may have sounded good at the time, CCA's rampant fraud on its students has since become well-documented. At the time, Plaintiffs and CCA's students were being misled into taking out the High-Interest Private Loans by a well-funded campaign of written and oral misrepresentations and omissions concerning CCA's career-placement resources and its students' graduation rates, job-placement rates, post-graduation income levels, and delinquency and default rates. As a result, Plaintiffs had no idea of the true facts concerning CCA or the High-Interest Private Loans—true facts that made attending CCA and taking out these loans an economically irrational act. Contrary to CCA's recruiters' misrepresentations, (i) CCA had little to no job placement resources; (ii) CCA enjoyed a horrible reputation in the culinary field, such that its graduates were shunned, rather than hired; (iii) CCA students had high unemployment rates; (iv) CCA students had extremely low income levels that were not commensurate with CCA's tuition; and (v) CCA students had high dropout, delinquency and default rates on their High-Interest Private Loans. Sallie Mae, CCA's "partner" lender, whose sales and marketing employees worked with CCA's "financial aid" office "on a daily basis," was aware of these misrepresentations.

11. In fact, at all relevant times, Sallie Mae was carefully analyzing the delinquency and default rates that were occurring on loans to students of its "partner" schools, including CCA. Sallie Mae has since repeatedly stated that one of the key factors in determining the "value" of a loan is the school the student is attending. At all relevant times, Sallie Mae had engaged in significant due diligence, developed sophisticated underwriting models, and assembled substantial data when it ramped up its multi-billion dollar program of lending to students at "non-traditional" schools like CCA. Indeed, it later admitted that it knew that the these loans were "predictably not collectable." In fact, CEC has since admitted that at the time, Sallie Mae had negotiated a "recourse loan agreement," whereby CEC actually agreed to "repurchase loans originated by [Sallie Mae] to our students after a certain period of time." (CEC 2011 10-K at 121.)

12. Thus, when Sallie Mae loaned the money that allowed Plaintiffs to enroll, it knew CCA students were defaulting on much smaller, lower-interest federal student loans at rates that substantially exceeded the rates at which traditional college students default on such loans. Sallie

---

1   Mae also knew that by setting very high interest rates (typically in the range of 12-15%) on its

2   High-Interest Private Loans—often two to four times larger than on federal loans—it was

3   significantly diminishing Plaintiffs' chances of fully repaying these loans. Sallie Mae further knew

4   that this would likely result in significantly raising the Plaintiff class's High-Interest Private Loan

5   default rates relative to traditional student loan default rates. Sadly, this likelihood has been

6   realized; the putative class has defaulted at extraordinarily high rates.

7         13.     While Plaintiffs suffered, Sallie Mae prospered. Sallie Mae's "preferred lender"

8   arrangement with CCA and other "for profit" schools allowed Sallie Mae to expand its High-

9   Interest Private Loan portfolio, sell "asset-backed securities" ("ABS") based on these loans, and

10  artificially inflate its publicly-traded stock price. The resulting high volume of High-Interest

11  Private Loans to CCA students and other students at for-profit schools helped create a portfolio

12  that, on paper, increased Sallie Mae's worth, as the loans were so large and the interest rates so

13  high. Sallie Mae was able to inflate its balance sheet with billions of dollars of loans to Plaintiffs

14  and others at similar non-traditional schools. Sallie Mae's scheme intentionally inflated its stock

15  price and attracted potential acquirers. (This has been the subject of a separate, successful

16  securities class action by Sallie Mae shareholders.) Moreover, because the High-Interest Private

17  Loans have such high interest rates and Sallie Mae's own cost of funds is so low, Sallie Mae can

18  profit even if the loans are never repaid fully. Sallie Mae's cost of funds (estimated at 1% or 2%)

19  is negligible compared to its High-Interest Private Loans' typical compound interest rates of 12-

20  15%. Also, because student loans generally are not dischargeable in bankruptcy, Sallie Mae can

21  squeeze out small amounts of money from the student borrowers for the rest of their lives. Sallie

22  Mae demands Plaintiffs' small paychecks, even when the payments do not cover the accumulating

23  interest, allowing Sallie Mae to profit while the CCA students' High-Interest Private Loan balances

24  continue to increase.

25        14.     Sallie Mae's agreement with CCA also provided necessary benefits to CCA and

26  CEC because it was a key part of their success in duping students to sign up for their worthless

27  programs. It allowed them to tell its students that getting loans to pay for the high tuition would be

28  "no problem" because they could use Sallie Mae to get them. The students CCA and CEC were

1   targeting for enrollment were from some of the most vulnerable populations in California.  Without

2   a student lender who was willing to work hand-in-glove with CCA to quickly "rubber stamp" large

3   loans to these students, CCA could not have succeeded in recruiting so many of them or charging

4   them such staggeringly high tuition.

5          15.    While Sallie Mae knew that CCA had high delinquency and default rates, it worked

6   with CCA to hide the wave of defaults on the High-Interest Private Loans for years, until analysts

7   noticed Sallie Mae's "loan loss" reserve had greatly increased due to the growing avalanche of

8   defaults.  Confronted with questions about these losses, on a conference call with investors (not a

9   forum that CCA students attended), Sallie Mae's Chairman for the first time openly acknowledged

10  that these loans were "predictably not collectible."  He admitted that many students attending CCA

11  and other similarly valueless schools likely would never be able to earn sufficient income to repay

12  in full the loans they were taking out.  In his words, students attending such schools "had no

13  business" taking out such loans.

14         16.    Sallie Mae disclosed none of this to Plaintiffs before funding their High-Interest

15  Private Loans.  Instead, Sallie Mae opportunistically peddled its high-interest loans, preying upon

16  innocent, well-intentioned students who now face a lifetime of insolvency and servitude to their

17  note holders.  These loans, which typically are non-dischargeable under the bankruptcy code, have

18  wrecked Plaintiffs' finances, ruined their credit, and mired them in ever-increasing debt from

19  which many will never be free.

20         17.    Had Sallie Mae disclosed what it knew to Plaintiffs when Plaintiffs applied for their

21  High-Interest Private Loans, Plaintiffs never would have signed the promissory notes at issue and

22  would have avoided their current prospective lifetimes of indebtedness.

23         18.    Plaintiffs now seek relief for the substantial injuries they have suffered on account

24  of Sallie Mae's conduct.  That relief can give Plaintiffs a future.  And that relief is available here.

25         19.    First, as detailed below, Sallie Mae was on notice that CCA was defrauding its

26  students, and Sallie Mae intentionally facilitated that fraud and perpetrated its own fraud against

27  CCA's students.  It did so for its own profit, despite the devastating harm to Plaintiffs and their

28  families.

20.     Second, when one party to a contract knows the other party is mistaken about key facts yet fails to disclose the truth, the mistaken party can later cancel the contract.  Here, Sallie Mae, Plaintiffs' lender, had exclusive knowledge of these material facts that were unknown to Plaintiffs and Class members.  Sallie Mae, but not Plaintiffs, knew that Plaintiffs' default and delinquency rates would be many multiples that of typical student loans, leading to the imposition of substantial monetary penalties and a mountain of ruinous debt for these students.  Sallie Mae furthermore knew that if the Plaintiffs had known these facts they would never have signed up for the loans, since doing so would amount to voluntarily destroying their financial security and well-being.  Yet Sallie Mae, in a rush to issue as many of these loans as possible, did not apprise Plaintiffs of this vital fact and other material facts.  Case law dictates that Sallie Mae should not profit from its misconduct, just as Plaintiffs should not face massive, lifelong debt due to their mistakes of fact.

21.     Third, Sallie Mae has engaged in conduct that is unlawful, unfair, fraudulent, and deceptive, in violation of the consumer protection statutes that regulate unscrupulous business conduct.  These laws were enacted by the legislature for the express purpose of preventing companies from taking advantage of unsuspecting consumers.  Whereas Sallie Mae engaged in misconduct for its own profit at the great expense of less sophisticated consumers, the law provides relief so that Plaintiffs need not suffer a lifetime of financial ruin.

22.     Fourth, Sallie Mae's exclusive knowledge regarding materials facts concerning its High Interest Private Loans, as well as its involvement with CCA (*e.g.*, its preferred lender and "recourse loan" agreement), gave rise to a duty to disclose the truth regarding CCA students' default and delinquency rates, as well as other material facts detailed herein.  Sallie Mae, however, ignored this duty, breaching its duty of care to Plaintiffs.

**PARTIES**

23.     Plaintiff Andrew Bradshaw is a resident of Clearlake Oaks, California.  He is a CCA graduate who took out a Sallie Mae High-Interest Private Loan to help finance his culinary education.  At its inception, his High-Interest Private Loan was for $24,571.05.  But with an interest rate of 13.125%, his current outstanding balance is $63,338.99—even though he already

has paid Sallie Mae $10,678.94. Mr. Bradshaw can no longer afford his monthly payment of $733.48, despite his best effort to stay current on his High-Interest Private Loan.

24. Mr. Bradshaw's only culinary job since he graduated from CCA was a short stint in the bakery department at Safeway, where he was told he did not need a culinary education for his position. His hourly wage at Safeway was $8.25. He is now unemployed. Mr. Bradshaw is unlikely to be able to repay his High-Interest Private Loan in full. He would not have taken out his High-Interest Private Loan but for his mistake of fact and Sallie Mae's failure to disclose the material facts it knew, as alleged in this Complaint.

25. Plaintiff Tanif Stephenson is a resident of San Jose, California. She is a CCA graduate who took out two Sallie Mae High-Interest Private Loans to help finance her culinary education. At their inception, her High-Interest Private Loans were in the combined amount of $16,365. However, with an interest rate of 13.125%, and despite the fact that she already has paid Sallie Mae $15,000, her current outstanding balances on the loans is now $46,214.54.

26. Ms. Stephenson's only culinary-related employment since she graduated from CCA was a five-month job as a cashier in a corporate dining cafeteria, where she occasionally performed light preparation work in the kitchen. Her hourly wage was $9.00. She was unable to find any other culinary work after being laid off from this position, and she believes her CCA credential actually hurt her culinary-job prospects. When Ms. Stephenson first graduated from CCA, her monthly payments were roughly $450 and her interest rate was 10%. However, any time that she has had trouble with her loans, Sallie Mae has refused to work with her and instead has either raised her interest rate, her monthly payment amount, or both. Ms. Stephenson is now unemployed and is unable to make her $600 monthly payments. She is unlikely to be able to pay off her High-Interest Private Loans in full. Ms. Stephenson would not have taken out her High-Interest Private Loans but for her mistake of fact and Sallie Mae's failure to disclose the material facts it knew, as alleged in this Complaint.

27. Plaintiff Adam Corriveau is a resident of Northampton, Massachusetts. He is a CCA graduate who took out a Sallie Mae High-Interest Private Loan to help finance his culinary education. At its inception, his High-Interest Private Loan was in the amount of $45,974.00.

1    However, unable to make monthly payments and with an interest rate of 13.125%, Mr. Corriveau's

2    current outstanding balance is $154,138.54.

3         28.    Mr. Corriveau has held various low-paying culinary positions since graduating from

4    CCA, mostly as a line cook.  The highest wage he has ever earned through this work was $2,600.00

5    per month.   He was laid off from that job after three months.  He now works as a line cook at

6    Coco, a restaurant where he makes an hourly wage of $16.00.  Given this low wage, Mr. Corriveau

7    is unable to both support his family and make his $1,800 monthly loan payments.  Mr. Corriveau is

8    unlikely to be able to pay off his High-Interest Private Loan in full.  He would not have taken out

9    his High-Interest Private Loan if not for his mistake of fact and Sallie Mae's misconduct, as alleged

10   in this Complaint.

11        29.    Plaintiff Jesell Gonzales is a resident of Daly City, California.  She is a CCA

12   graduate who took out two Sallie Mae High-Interest Private Loans to help finance her culinary

13   education.  At their inception, her High-Interest Private Loans were in the combined amount of

14   $41,748.00.  However, unable to make monthly payments due to her low-paying and unsteady job

15   history, and with an interest rate of 8.75% on the first loan and 12.25% on the second, as of her

16   September 2013 statement her outstanding combined balance on her High-Interest Private Loans

17   was $111,330.05.

18        30.    Ms. Gonzales has held various part-time and seasonal positions in the culinary field

19   since graduating from CCA in 2007, but has struggled to find a permanent culinary job.  For one

20   month she worked as a cook on a cruise ship, making an hourly wage of $20.00.  For a few months

21   thereafter she had a temporary job helping to open a Whole Foods store, earning an hourly wage of

22   $12.00.  Roughly a year later she held a part-time seasonal position at Air Chef, an airline catering

23   company.  For the four months she was employed by Air Chef, her hourly wage was $12.00.  In

24   early 2009 she worked for two months as a line cook at Castlewood Country Club, making an

25   hourly wage of $15.00.  Despite her best efforts, she was then unemployed and only just found a

26   job working in a bakery, earning an hourly wage of $9.  Her first day of work for this job is

27   November 11, 2013.  Ms. Gonzales is unlikely to be able to pay off her High-Interest Private Loans

28   in full.  She would not have taken out her High-Interest Private Loans if not for her mistake of fact

and Sallie Mae's misconduct, as alleged in this Complaint.

31.     Defendant SLM Corporation ("SLM") is a Delaware corporation with its principal place of business in Newark, Delaware.  SLM, directly and/or through one or more of its subsidiaries, is engaged in the business of originating, servicing, and purchasing loans that finance the cost of a student's education, including Plaintiffs' and Class members' High-Interest Private Loans.  Through one or more of its subsidiaries, SLM owns, manages, and/or services over eleven million student loans, totaling more than $234 billion in education loans.

32.     Sallie Mae owns Plaintiffs' and Class members' High-Interest Private Loans under various names.  SLM, its subsidiaries, or its predecessor in interest, the Student Loan Marketing Association, issued, as the de facto actual lender, Plaintiffs' and other Class members' High-Interest Private Loans.  It serviced these High-Interest Private Loans under the name Sallie Mae Servicing LLP, which was a division of SLM until December 31, 2003, when Sallie Mae Servicing LLP was merged into Sallie Mae, Inc., and thereafter serviced them through Sallie Mae, Inc.

33.     Defendant Sallie Mae, Inc. (referred to herein collectively with SLM as "Sallie Mae"), the corporate management and marketing subsidiary of SLM, is a Delaware corporation with its principal place of business in Newark, Delaware.  Sallie Mae, Inc. services High-Interest Private Loans.  Sallie Mae, Inc. has serviced Plaintiffs' and other Class members' High-Interest Private Loans since they were made to the present, either under its own name or through Sallie Mae Servicing LLP, which was merged into Sallie Mae, Inc. in December 2003.  Sallie Mae, Inc. has assessed and collected principal payments, interest payments, and various fees from Plaintiffs and other Class members.

34.     At all relevant times, all Sallie Mae entities, including SLM and Sallie Mae, Inc., referred to each other as "Sallie Mae" in their communications with Plaintiffs.   For example, in the High-Interest Private Loans entered into by the Plaintiffs and their peers, the communications were simply from "Sallie Mae."  At all times, defendants appeared to act as a unitary entity.  There was thus no way for Plaintiffs to have known what communications, if any, were sent by only either Defendant SLM Corporation and Defendant Sallie Mae, Inc., as opposed to both, and to know now the specific role played by Defendant SLM versus the specific role played by Sallie Mae, Inc.

12330

**JURISDICTION AND VENUE**

35.     Jurisdiction: Jurisdiction of this Court is proper under 28 U.S.C. § 1332.  The requisite diversity among the parties exists.  Representative Plaintiffs Bradshaw, Stephenson, and Gonzales are all citizens of California, and Plaintiff Corriveau is a citizen of Massachusetts.  SLM and Sallie Mae, Inc. are both incorporated in the State of Delaware and have their primary offices in Newark, Delaware.

36.     The amount in controversy exceeds $5,000,000 for Plaintiffs and Class members collectively, exclusive of interest and costs, by virtue of the illegal revenue and profit reaped by Sallie Mae from its transactions with Plaintiffs and the Class, as well as by virtue of the equitable relief sought.

37.     Many putative class members, including but not limited to Plaintiffs Corriveau and Gonzales, have claims whose value exceeds $75,000.

38.     Based on the number of High-Interest Private Loans Sallie Mae issued to CCA students during the relevant period, there are likely thousands of Class members.

39.     Intradistrict Assignment: Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).  Sallie Mae has agents, transacts business, and/or is otherwise found within this judicial district.  Sallie Mae has received substantial compensation from such transactions and business activity in this judicial district, including the servicing of student loans for persons residing in this judicial district.  A substantial part of the events and omissions that give rise to the claims alleged herein occurred in San Francisco.

40.     Plaintiffs' and Class members' High-Interest Private Loans specify Oklahoma law to govern with respect to contractual issues, without regard to conflict of law rules.  Plaintiffs and Class members allege that California law applies with respect to tort and other non-contract claims.

///

///

///

///

///

12330

**ALLEGATIONS COMMON TO ALL CLAIMS***

## I. PLAINTIFFS AND CLASS MEMBERS WERE MISLED AND UNAWARE OF KEY FACTS ABOUT THE EDUCATION THEY FINANCED WITH SALLIE MAE HIGH-INTEREST PRIVATE LOANS.

41.     CCA is a California corporation that operates a for-profit culinary school in San Francisco, California.  During the relevant timeframe, CCA's school offered the following programs to students: (1) a sixty-week program leading to an "Associate of Occupational Studies Degree in Le Cordon Bleu Culinary Arts" (the "Culinary Arts Program"), (2) a thirty-week program leading to a "Baking and Pastry Arts Certificate" (the "Baking and Pastry Program"), and (3) a forty-five week program leading to an "Associate of Occupational Studies Degree in Le Cordon Bleu Hospitality & Restaurant Management" (the "Management Program") (collectively, the "Programs").

42.     Plaintiffs and Class members were induced to apply to and attend CCA by numerous false and misleading representations that have since come to light.  Among CCA's false and misleading representations were the following: (a) admission to CCA was a competitive and selective process; (b) CCA had an extensive network of contacts and close relationships with prestigious restaurants and other food-service employers who employed CCA graduates in one or more of the positions for which CCA promised to train them; (c) CCA had an excellent reputation; (d) CCA students had an extremely high rate of job placement in jobs for which the students seek to be trained; (e) that the tuition and programs offered by CCA (approximately $48,000 for the Culinary Arts Program, $28,000 for the Baking and Pastry Program, and $38,000 for the Management Program) could be financed responsibly through student loans, with a resulting debt service burden that could be repaid reasonably; (f) that CCA graduates had income levels commensurate with the loans necessary to attend these programs; and (g) that CCA students had a low rate of delinquency or default on such loans.   It was CCA's custom, policy, and/or practice to make these representations, or as many as necessary, to recruit prospective applicants to attend

---

* Plaintiffs' allegations result from the investigation of counsel, including but not limited to the review of written material and interviews of individuals with knowledge of the allegations, as well as from Plaintiffs' own experiences.

1    CCA and, at the same time, to direct Plaintiffs and Class members into taking out the High-Interest

2    Private Loans.

3          43.     CCA and CEC's pattern and practice of making material false representations and

4    omissions to defraud students into enrolling in its for-profit schools have been well-documented.

5    For example, on August 19, 2013, CEC agreed to pay more than $10 million to settle the state of

6    New York's claim that the company systematically deceived students by advertising phony job

7    placement rates at its career-oriented schools.

8          44.     After a two-year investigation by New York's Attorney General's Office, CEC

9    entered into the settlement.  The settlement document states that CEC lied to prospective students

10    and to regulators when advertising the percentage of students successfully placed in jobs after

11    graduation -- a marketing technique that allowed the company to boost enrollments and revenues to

12    record highs in recent years.  According to the settlement document, CEC advertised job placement

13    rates of 55 percent to 80 percent at its schools in New York, when the placement rates were

14    actually 24 percent to 64 percent.

15          45.     The same sorts of representations and non-disclosures are at issue here.  CCA's

16    misrepresentations and omissions, which were materially false and/or misleading, allowed CCA to

17    justify extraordinarily high tuition and fees.  Moreover, CCA knew these representations were false

18    and/or misleading at the time they were made to Plaintiffs and other Class members.   Both Sallie

19    Mae and CCA also knew that almost all of the students attending CCA would not have been able to

20    enroll without Sallie Mae's providing students the High Interest Private Loans.

21          46.     CCA failed to disclose facts—known to it at the time—that were contrary to their

22    affirmative misrepresentations regarding the quality, prestige, and marketability of a CCA

23    education.  CCA also failed to disclose facts necessary to prevent the above-described

24    representations from being fraudulent, misleading, and/or likely to deceive.

25          47.     The sad, true fact is that a CCA education does not significantly increase graduates'

26    incomes and opportunities in the food-service industry.  CCA's reputation has plummeted since the

27    late 1990s.  Indeed, food-industry personnel and potential employers snicker that CCA stands for

28    "Can't Cook Anything."

12330

48.     CCA's poor reputation in the food-service industry may in fact hurt its students' opportunities in the relevant job market.  CCA students have reported that the school's reputation with prospective employers is so bad that the school's graduates have an easier time obtaining jobs when they omit from their resumes, let alone attempt to "leverage," their degrees from the school. At the very least, a CCA education does not bolster its students' employment opportunities.

49.     Contrary to CCA's misrepresentations, admission to CCA was virtually guaranteed by showing up and paying tuition.  Between this low admission standard, which was instituted when CCA was purchased by its now-parent company, and the low quality of education afforded to CCA students, at least relatively recent attendees of CCA, including Plaintiffs and Class members, lack the pedigree that an expensive culinary institution should accord.  Accordingly, a degree from CCA does not inspire confidence in the minds of prospective employers, denotes an unlikelihood rather than a likelihood of capability, and is frequently a detriment to graduates seeking employment—including those who have mastered the appropriate skills—because of the bad and worsening reputation of CCA in the San Francisco Bay Area and elsewhere.

50.     Few graduates of CCA are hired by prestigious employers.  Most CCA graduates, in fact, have a difficult time finding any well-paying job in the culinary field.  Many employers, including former CCA students, will not hire CCA graduates because of the poor quality of education that CCA students receive.  To the extent CCA graduates find food-and-beverage-related jobs, those jobs are often minimum-wage or other low-paying positions.  Such employees do not need culinary degrees to occupy these positions.

51.     CCA does not provide students with any meaningful assistance in finding employment.  CCA does not have an extensive network of contacts and close relationships with prestigious restaurants and other food-service employers with whom CCA graduates can obtain employment.  Rather, most CCA students find jobs in the industry, if at all, as a result of their own efforts and despite their CCA "credential."  To the extent CCA graduates secure culinary jobs at all, their low-wage positions do not pay enough money for the students to meet the exorbitant monthly payments owed on the loans they took out to attend CCA.  As a result, and in light of the hefty loan payments they face upon graduation, many students ultimately are economically forced

12330

to leave the food-service industry entirely, defeating the purpose of their having attended CCA.

52.     CCA published job-placement rates to Plaintiffs and Class members, both orally and in writing, that were materially inflated, inaccurate, false, and/or misleading.  CCA's alleged placement rates: (a) included students who worked as externs, as required to complete their Program; (b) were statistically meaningless because many graduates were never interviewed, polled, or surveyed regarding their employment status after graduation; and/or (c) included all persons working only marginally in the food-service industry, such as, by way of example only, graduates working at Starbucks for low hourly wages—a job for which a culinary education is not useful or necessary, a job that does not command a rate of pay that warrants the cost of CCA's program, and a job that will not enable a graduate to service the debt he or she incurred to attend CCA (including Sallie Mae High-Interest Private Loans).

53.     Although CCA had a pattern and practice of telling Plaintiffs and Class members that their loan payments would be easily manageable based upon the salaries they would earn upon graduation, CCA knew this was false.  Many CCA graduates earn no more than $10-12 an hour, yet are required to pay $700+ per month for their CCA-related student debt.  Accordingly, many graduates seek deferrals or forbearances, which generally result in even higher repayment amounts. And, of course, the students' High-Interest Private Loans typically are not dischargeable under the Bankruptcy Code, regardless of the student borrowers' ability to pay.

54.     CCA's misleading acts and omissions were perpetrated methodically by CCA representatives pursuant to a program developed and prescribed by CEC.  For purposes of this Complaint, that program is referred to as the Fraudulent Recruiting Program.

55.     CCA's representatives conducted the Fraudulent Recruiting Program systematically and daily on the phone, by mail, by email, and in face-to-face meetings with prospective students. Prospective CCA students, including each of the Plaintiffs and Class members when recruited, were misled by the misrepresentations and omissions of CCA and CEC (as well as by Defendants, as described below).  If Plaintiffs and Class members had known the true facts, they would not have purchased what CCA sold to them or borrowed money from Sallie Mae to purchase it.

56.     CEC's Fraudulent Recruiting Program has recently been the subject of several

government investigations.  In addition to the recent $10+ million settlement by CEC with the state of New York, in July of 2012, the United States Senate's Health, Education, Labor and Pensions Committee issued a detailed Staff Report concerning the harmful business practices of for-profit schools such as CEC and high rates of student loan delinquency, student loan default, student drop-out, and graduate unemployment ("Senate HELP Report").  CEC was one of the targets of the Senate's investigation.  The HELP Report detailed internal CEC documents that CEC used to train its recruiters. For example, "[i]n an internal training document, 'Telephone Tips,' CEC instructs its recruiters to 'NOT GIVE TOO MUCH INFORMATION' and 'create a sense of urgency' during calls with prospective students [emphasis in original.]"

57.     The same high-pressure sales efforts were used to cajole students into taking out the High Interest Private Loans without analyzing the true risks and without understanding the likely true financial consequences.

58.   The Senate HELP Report was extremely critical of CEC and other for-profit schools, noting:  "[f]or-profit colleges target a population of non-traditional prospective students who are often less familiar with higher education than other prospective college students and may be facing difficult circumstances in their lives."  (HELP Rpt. at 58.)

59.     In 2005, several CEC schools were the subject of a CBS news magazine "60 Minutes" report focusing on misrepresentations made by admission representatives to prospective students. A CBS associate producer visited the schools posing as a prospective student and uncovered several instances of misrepresentations by admissions representatives.  At one of the CEC schools, the producer asked about graduation rates and was told that 89 percent graduated, when, in fact, the school's graduation rate was 29 percent.  At another, the undercover producer was told by an admissions representative that the school was highly selective; however the undercover producer was unable to disqualify herself from admission into the medical assistant program.  She admitted to low grades, prior drug use and a "problem with blood," and received only 14 of 50 questions on her second attempt at passing the admissions test, but she still she was accepted into the program.

60.     Moreover, former admissions counselors at another CEC school told 60 Minutes that they were expected to enroll three high school graduates a week, regardless of the student's ability to complete the coursework.  According to these former CEC employees, if they did not meet those quotas, they would lose their jobs. One of the former admission counselors described the aggressive sales tactics that they were required to employ on the job: "we were really sales people . . . the job was a lot like a used car lot, because if I couldn't close you, my boss would come in, try to close you."   He also explained how they mislead prospective students:  "We're telling you that you're gonna have a 95 percent chance that you are gonna have a job paying $35,000 to $45,000 a year by the time they are done in 18 months.  We later found out it's not true at all."  Another commented: "You need three things, you need $50, a pulse, you've got to be able to sign your name. That's about it."

61.     CCA recruiters worked closely with Sallie Mae and the school's "financial aid" representatives to complete the package by arranging to finance the enrollment through High-Interest Private Loans.

62.     CCA and CEC's recruiters not only targeted vulnerable individuals and families in difficult circumstances, they trained their recruiters to exploit these difficult circumstances to "hard sell" these students into enrolling in their programs.  As the 2012 HELP Report repeatedly notes, for-profit schools such as CCA employ a large number of recruiters trained in "hard-sell tactics to enroll prospective students."  (Help Rpt. at 58.)  A "pervasive sales technique found in the documents of multiple companies is to manipulate a prospective student's emotions."  (*Id.* at 60.)  The 2012 HELP Report explains:

> According to this technique, a recruiter asks probing questions to find a prospective student's 'pain'—about a dead-end job, inability to support their children, failing parents or relatives.  They then use that 'pain' to make the student feel vulnerable.  Then, when the prospective student feels vulnerable, the recruiter will offer the prospective student the possibility of a college degree as the opportunity to make that pain go away.

(HELP Rpt. at 60.)

12330

63.     CEC employed an army of recruiters to sign up students for CCA's worthless programs and arrange for the students to obtain High Interest Private Loans through Sallie Mae. Of the 30 schools examined by the Senate HELP Report, the schools employed 35,202 recruiters, or about one recruiter for every 53 students attending a for-profit college in 2010.  (*Id.* at 4.)  The Report found that CEC employed a total of 2,668 recruiters during the time period in question. (*Id.* at 49.)

64.     These schools trained their recruiters to operate in a "boiler room atmosphere" in which recruiters' compensation and continued employment were dependent upon the amount of students they convinced to enroll in their programs.  (*Id.* at 48-50.)

65.     While recruiters are labeled "advisors" or "counselors," this label is itself deceptive: their sole aim is to recruit students.  (*Id.* at 53.)  "Internal coaching and disciplinary memoranda show that managers focus on one thing:  meeting quotas of new enrollment set from above."  (*Id.* at 48-50.)  Recruiters were hired based on sales experience.  (*Id.* at 50.) Their managers created an atmosphere that prioritized "hitting an enrollment quota."  (*Id.* at 51.)  Those who failed to meet these quotas were put into review and their employment terminated.  (*Id.* at 51-52.)

66.     These schools also trained their recruiters to use misleading and fraudulent sales tactics that mislead prospective students with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, or the reputation and accreditation of the school.  (*Id.* at 4.)  After an extensive undercover investigation, the Senate HELP report concluded that "[t]he tactics associated with recruiting students to enroll in for-profit colleges are widespread. . . . At many schools, at least during the period examined, misleading students to secure enrollment contract appeared to be a common practice rather than an exception."  (*Id.* at 47.)

67.     In fact, these misleading and deceptive tactics are so widespread, the HELP Report concluded: "internal documents, interviews and with the Government Accountability Office (GAO) undercover recordings demonstrate that virtually **every company reviewed**

12330

misled some prospective students or omitted information with regard to the cost of the program, the availability and obligations of Federal aid, the time to complete the program, the completion rates of other students, the job placement rate of other students, the transferability of the credit, **and** the reputation and accreditation of the school." (*Id.* at 53 (emphasis added).)  CEC was one of the largest for-profit schools investigated, and was obviously included in this statement.

68.     In truth, a CCA degree is, and at all relevant times was, worth no more—and probably less—than a culinary degree from San Francisco Community College.  However, a culinary degree from San Francisco Community College costs approximately $2,000, or 14-24 times less than a CCA education.  San Francisco Community College culinary students would not need to finance their culinary education with Sallie Mae High-Interest Private Loans.

69.     Sallie Mae, as CCA's "partner" lender, was in a position to know of these misrepresentations and the true facts unknown to students.  Sallie Mae failed to disclose to Plaintiff's and Class members key facts regarding its relationship with CCA; the actual delinquency and default rates it expected and in fact predicted on the High Interest Private Loans; what Sallie Mae knew about CCA and similar for-profit schools; and the true risks of taking out the High Interest Private Loans.   Sallie Mae also misled students about its credit review and failed to disclose just how loose its credit criteria standards were and how easy it was to get a High Interest Private Loan.

70.     As a result of these misrepresentations and omissions, Plaintiffs and Class members have been damaged by incurring debt on High-Interest Private Loans that they otherwise would not have taken out and by paying interest and fees on student loans that they took out in order to pay the substantial CCA tuition.

## II. SALLIE MAE ACTIVELY AND KNOWINGLY PARTICIPATED IN CCA'S EFFORTS.

71.     Almost all CCA recruits, including Plaintiffs, could not afford to personally finance their CCA tuition.  Federally subsidized loans and grants often can and do defray some of the costs.  However, to pay CCA's extraordinarily high tuition and fees, federal funds usually cover only a small fraction of each student's bill.  Accordingly, CCA's Fraudulent Recruiting Program would

12330

1    have failed unless Sallie Mae worked with CCA to ensure the availability of private loans for its

2    prospective students to make up the remaining tuition balance.

3    　　　　72.　　Sallie Mae had an agreement with CCA under which CCA would recommend Sallie

4    Mae as a "preferred lender" to prospective students:  Sallie Mae would provide these students

5    High-Interest Private Loans to pay the balance of their educational costs not covered by federal

6    grants and loans.

7    　　　　73.　　This "sweetheart deal" between Sallie Mae and CCA allowed Sallie Mae to

8    dramatically expand its loan portfolio.  While Sallie Mae knew that the High Interest Private Loans

9    were more likely to default, it viewed these loans as "loss leaders," meaning that it was willing to

10   make these risky loans in exchange for becoming the leading provider of loans to the hundreds of

11   thousands of students that CCA and its parent company serve.

12   　　　　74.　　Indeed, as part of their deal, Sallie Mae and CEC had a "recourse loan" agreement:

13   CEC would actually "repurchase loans originated by [Sallie Mae] to our students after a certain

14   period of time."  (CEC 2011 10-K at 121.)  This "recourse loan" agreement ended on March 31,

15   2008.

16   　　　　75.　　Sallie Mae did not disclose the facts regarding its special agreement with CCA and

17   how the "preferred lender" relationship allowed it to lend under circumstances where Sallie Mae

18   could predict high default rates.

19   　　　　76.　　Following advice from CCA's representatives and the encouragement of Sallie Mae,

20   Plaintiffs took out numerous High-Interest Private Loans from Sallie Mae in order to finance their

21   CCA education.

22   　　　　77.　　As used in this Complaint, Sallie Mae "High-Interest Private Loans" are loans made

23   by Sallie Mae to students to pay for the students' CCA education, including tuition, fees, and

24   associated costs and living expenses.  Commonly known and marketed by Sallie Mae brand names,

25   such as CEC Signature Loans, High-Interest Private Loans are private loans for which Sallie Mae

26   charged high interest rates and off of which Sallie Mae made significant profits.  Sallie Mae did not

27   negotiate the terms of these loans with Plaintiffs and Class members, and instead offered its High-

28   Interest Private Loans on an adhesion, take-it-or-leave-it basis.

Second Amended Complaint

12330

78.    Plaintiffs and Class members were not encouraged to take out private loans from anyone other than Sallie Mae.  CCA and Sallie Mae worked in concert to apprise prospective CCA students that they had been approved for Sallie Mae's High-Interest Private Loans, generally without presenting other private-loan providers or advising them to consider other private-loan providers.

79.    CCA, CEC, and/or their employees received benefits from Sallie Mae in connection with arranging these loans.  However, CCA, CEC, Sallie Mae, and their respective employees did not disclose this agreement, including such benefits, to CCA students.

80.    For at least two independent reasons, Sallie Mae knew about and encouraged CCA's Fraudulent Recruiting Program:  First, Sallie Mae worked hand-in-glove with CCA and CEC, as well as with prospective CCA students.  Sallie Mae's employees and agents visited the CCA campus and frequently interacted with CCA staff.  It knew how CCA and CEC lured students to matriculate at the school, and it knew that the students relied on CCA's misrepresentations.  Sallie Mae was well aware of how CCA sold itself to these prospective students.

81.    Sallie Mae's presence on CCA's campus was part of a strategy that Sallie Mae replicated on campuses throughout the country.  It intentionally maintained personnel and forged relationships on campuses so that it could, in its own words, "control the front-end origination process" for its loans with students.  In order to control the issuance of High-Interest Private Loans to Plaintiffs and other Class members, Sallie Mae worked closely with CCA personnel and students, on and off CCA's campus, and was well aware of CCA's recruitment and financial-aid strategies.

82.    Second, Sallie Mae conducts substantial research and analysis into the graduation rates , graduate employment statistics, and loan repayment history for the students of the schools that its borrowers attend.

83.    As but one example, Sallie Mae's 2002 10-K acknowledged that, in its effort to predict likely default and delinquency rates for students to whom Sallie Mae issued High-Interest Private Loans, Sallie Mae engaged in numerous and complex calculations.  Among the input to these calculations, the statement continued, were a school's historic data, graduates' recent

12330

1    delinquency trends, credit profiles of its borrowers, loan volume by "program" (presumably, by

2    school), and history of charge-offs and recoveries.  Sallie Mae closely tracked and considered

3    numerous factors regarding a school, its borrowers, and their repayment history.

4          84.     Moreover, Plaintiffs' High-Interest Private Loan applications and promissory notes

5    admit that the interest rate for their High-Interest Private Loans varied based on the school the

6    borrower attended (here, CCA).  With potentially hundreds of millions of dollars hanging in the

7    balance, Sallie Mae considered carefully the value of a CCA education, the school's graduation

8    rate, its recent employment figures, and the recent historical ability of its graduates to repay (or

9    not) their loans.

10         85.     Sallie Mae was acutely aware, by the time Plaintiffs and Class members sought

11    loans to attend CCA, that a CCA education was not worth what it had been a decade prior, that a

12    significant percentage of CCA's students were unemployed or making very low wages, and that

13    CCA students were financially unable to repay fully the High-Interest Private Loans.

14         86.     Sallie Mae learned from its collection efforts—for example, in phone calls to

15    borrowers who were not paying their loans, wherein those borrowers explained their

16    circumstances— that CCA students had low employment rates, low wages, and could not keep up

17    with monthly High-Interest Private Loan payments due to their resulting lack of income.  However,

18    Sallie Mae and its employees did not disclose these hard facts to Plaintiffs or Class members,

19    *despite knowing* that CCA recruiters were making—and Plaintiffs and Class members were relying

20    upon—inaccurate, misleading, and incomplete representations regarding these same facts.  Instead,

21    Sallie Mae kept its knowledge about CCA's Fraudulent Recruiting Program and resultant

22    consequences to itself.

23         87.     The arrangement between Sallie Mae and CCA/CEC greatly benefited both parties:

24    CCA needed its students to receive private loans to cover its exorbitant tuition.  Without the

25    purchase money financing Sallie Mae provided, CCA could not have carried out its fraudulent

26    scheme.  Sallie Mae, in turn, profited handsomely from the pipeline that CCA provided Sallie Mae

27    to the school's needy students.  Due to the "preferred lender" arrangement, CCA students took out

28    Sallie Mae High-Interest Private Loans at far greater rates than they would have absent CCA's

12330

1    active encouragement.  Sallie Mae thus had an interest in facilitating CCA and CEC's enterprise,

2    and it extended the High-Interest Private Loans to Plaintiffs and Class members for that purpose.

3    Sallie Mae wrote hundreds of millions of dollars in High-Interest Private Loans, inflating its

4    balance sheet and profits.  Sallie Mae acted purposefully, with actual knowledge of CCA/CEC's

5    fraud and of Plaintiffs' ignorance of the true facts, pursuing its own substantial profit with no

6    regard for the devastating consequences to Plaintiffs.

7    **III. SALLIE MAE ENCOURAGED STUDENTS TO TAKE OUT THE  HIGH-
8    INTEREST PRIVATE LOANS AS PART OF A SELF-SERVING SCHEME TO
     BOLSTER ITS PROFITS.**

9    **a.    Sallie Mae's Business Is Enhanced By Issuing More High-Interest Private
10   Loans and Servicing Fewer Federal Loans.**

11   88.    Sallie Mae is the largest student lender in the United States.  Through its

12   subsidiaries, it originates, acquires, services, and collects student loans, primarily High-Interest

13   Private Loans and loans made through the Federal Family Education Loan Program (commonly

14   known as FFELP loans).

15   89.    Students typically enter into High-Interest Private Loans only after they have

16   borrowed the maximum amount of federal loans and grants for which they are eligible because

17   High-Interest Private Loans typically carry higher interest rates and fees than federal loans.

18   90.    Unlike most federal loans, High-Interest Private Loans are not eligible for federal

19   loan repayment programs ("FLRPs"), such as the Income-Based Repayment or Income-Contingent

20   Repayment programs.  FLRPs allow borrowers experiencing financial hardship to lower their

21   monthly payments and, in some cases, to receive a temporary government subsidy of interest

22   payments.

23   91.    In contrast, High-Interest Private Loan borrowers with little to no income have no

24   similar option to lower their monthly payments.  Accordingly, typical borrowers of Sallie Mae

25   High-Interest Private Loans can quickly reach an insurmountable level of indebtedness once their

26   monthly payments exceed what they can pay.  Because Sallie Mae capitalizes unpaid interest and

27   fees on these loans—adding this back to the principal—unpaid and/or deferred High-Interest

28   Private Loan balances can balloon rapidly to two or three times their original amount, as do the

12330

attendant monthly payments.

92.     Because federal loans have lower interest rates than Sallie Mae's High-Interest Private Loans, they are far less profitable to Sallie Mae than High-Interest Private Loans.  In 2006, the average interest rate Sallie Mae charged on a FFELP loan, for instance, was approximately 6.54%.  The spread or profit, which is the difference between the income earned on the loan and the interest paid on the debt to fund the loan, was just 1.26%.

93.     While the federal government caps the interest rate for FFELP loans, Sallie Mae is free to charge nearly any interest rate and fees for High-Interest Private Loans.  As a result, the spread and fees on High-Interest Private Loans are usually much higher than on FFELP loans.  In 2006, the average interest rate Sallie Mae charged on a High-Interest Private Loan was 11.9%. (All named Plaintiffs and many other Class members are currently being charged more than 10% on one or more of their Sallie Mae High-Interest Private Loans.)  Sallie Mae's spread (after accounting for loan losses) on its High-Interest Private Loans was 5.13%.

94.     Because High-Interest Private Loans are more profitable to Sallie Mae than federal loans, Sallie Mae has aggressively marketed its High-Interest Private Loans through on-campus financial aid offices, including at CCA.  As a result, despite the fact that a sound and well-accepted financial-aid strategy for students is to take out the maximum amount of available federal aid (in order to lower interest payments and be eligible for federal repayment programs), many of the Plaintiffs and/or other Class members did not take out the maximum available federal aid and, instead, took out more money than was necessary in the form of Sallie Mae High-Interest Private Loans.

**b.  Sallie Mae Dramatically Expanded its High-Interest Private Loans Portfolio.**

95.      Before the 2000s Sallie Mae's profits derived largely from its portfolio of FFELP loans, which comprised the bulk of its lending business.  In 1997, when Sallie Mae began its transition to a private company, as opposed to a Government-Sponsored Enterprise, it started to move away from its original model of providing federally guaranteed loans in favor of the more profitable High-Interest Private Loans.

96.     In 1998, Sallie Mae started to expand its High-Interest Private Loans portfolio

substantially.  It commenced offering private loans to borrowers who were enrolled in career

training courses or distance learning schools, attended a two-year or four-year proprietary school

(i.e., a private, for-profit school), or attended a four-year college less than half-time (all these are

referred to jointly in this complaint as "non-traditional" schools).  Sallie Mae knew that these

borrowers presented a significantly higher credit risk than full-time students who attended four-

year, non-profit colleges.

97.     In the 2000s, Sallie Mae dramatically expanded its portfolio of High-Interest Private

Loans to students at non-traditional schools.  Sallie Mae did so to increase its short-term and long-

term profits.  To protect and expand its market-leading loan volume in the face of legislative

changes that eroded its federally-guaranteed loan profits, Sallie Mae secretly relaxed its

underwriting standards and began writing billions of dollars of High-Interest Private Loans to

students who were not creditworthy, who were attending schools with graduates that had relatively

high default and delinquency rates on their student loans, who were attending schools with low

graduation rates, and who were in educational programs that would result in jobs with wages

insufficient to service the loans.

98.     Sallie Mae thus commenced loaning significant sums of money to students

attending non-traditional schools like CCA, which had students with higher delinquency and

default rates than those at traditional schools.  This shift constituted a material change in Sallie

Mae's business and credit risk exposure.  However, Sallie Mae concealed its new business plan

from Plaintiffs and Class members.  Sallie Mae only disclosed the information publicly well after

Plaintiffs and the Class members took out their High-Interest Private Loans with Sallie Mae.

99.     When Plaintiffs and Class members took out their High-Interest Private Loans—and

long thereafter—Sallie Mae represented that it had certain, defined, strict loan underwriting

standards in place for its High-Interest Private Loans.  For example, Sallie Mae's 2006 10-K stated,

in relevant part, as follows:

> Since we bear the full credit risk for [High-Interest Private Loans], they are underwritten
>
> and priced according to credit risk based upon standardized consumer credit scoring
>
> criteria. . . . We manage this additional risk through clearly-defined loan underwriting

standards . . . . As a result, we earn higher spreads on [High-Interest Private Loans] than on FFELP loans.  [High-Interest Private Loans] will continue to be an important driver of future earnings growth . . . .

100.     Sallie Mae's annual statements touted its strict underwriting of High-Interest Private Loans for every year that Plaintiffs and Class members took out their High-Interest Private Loans, as well as for the years that preceded Plaintiffs' applications for High-Interest Private Loans.  Sallie Mae's 2003 10-K, for example, claimed that all Sallie Mae High-Interest Private Loans were issued only for those who met the company's tested underwriting standards.

101.     Sallie Mae highlighted its alleged adherence to strict underwriting standards to convey to its investors, regulators, and prospective borrowers that Sallie Mae expected full repayment of its High-Interest Private Loans, the same as with its more traditional loans.

102.     Sallie Mae stated on numerous occasions that it expected full repayment on the vast majority of its High-Interest Private Loans.  For instance, Sallie Mae said in its 2002 10-K that it expected to "charge off" only approximately 1.3% of its High-Interest Private Loans.  During a call with analysts and investors in 2005, when it discussed its second quarter earnings, Sallie Mae expressed confidence that its High-Interest Private Loan portfolio was performing well, producing "solid results," and experiencing low delinquency and default rates.  In fact, in every year that Plaintiffs and Class members took out their Sallie Mae High-Interest Private Loans, Sallie Mae stated in its quarterly earnings calls that its High-Interest Private Loans were experiencing delinquency rates less than four percent.

103.     In its 2005 (first quarter) earnings call with investors, Sallie Mae's COO, Thomas Fitzpatrick, explained that Sallie Mae's delinquency rate (over 90 days) on its High-Interest Private Loans was a mere 2.5%.  He also noted that the company's "tolerance" for such delinquencies was only three percent.

104.     Although Sallie Mae represented to the public that (1) it adhered to strict, solid underwriting standards for issuing High-Interest Private Loans and (2) expected an exceedingly high percentage of those loans to be repaid in full, Sallie Mae was lying on both counts.

105.     Sallie Mae has since disclosed that it had significantly loosened its underwriting

12330

practices for High-Interest Private Loans. These changes were not revealed until much later, through admissions that Sallie Mae intentionally had not been selective in pursuing such new loan business and that Sallie Mae purposefully had violated its longstanding policy of lending only to students who were creditworthy and who went to schools offering an education that provided an economic benefit sufficient to allow them to repay their loans in full.

106. Sallie Mae relaxed its lending standards during the Class Period by, among other things, significantly reducing the credit score that a borrower needed to obtain a High-Interest Private Loan.

107. When Plaintiffs and Class members took out High-Interest Private Loans, Sallie Mae was all too happy to issue the loans, even when the students' FICO scores indicated to Sallie Mae that a significant percentage of them were unlikely to repay their High-Interest Private Loans in full. (After early 2008, Sallie Mae set an "absolute minimum" FICO score of 670 for borrowers attending for-profit schools such as CCA. Only later, however, did Sallie Mae disclose that the average FICO score for these loans (written in large part prior to 2008) was only 618 without a co-signor and 633 with a co-signor.)

108. Although Sallie Mae publicly expressed its strict underwriting for High-Interest Private Loans and its expectation of their full repayment, what it said privately (and later admitted publicly) was a very different story. A reported statement by Sallie Mae's then-CEO, Thomas Fitzpatrick, at an internal executive meeting in early 2007, summarized Sallie Mae's actual underwriting standards for High-Interest Private Loans at the time that Plaintiffs and Class members took out their loans: "If the borrower can create condensation on a mirror, they need to get a loan this year."

109. This statement is consistent with other recent admissions by Sallie Mae and its executives, who have since acknowledged that, during the 2000s, Sallie Mae: lent too much money in the form of High-Interest Private Loans to students who were likely candidates for delinquencies and defaults, lent too much money in the form of High-Interest Private Loans to lower-tier credit borrowers, lent too much money in the form of High-Interest Private Loans to students who could not generate enough income from their education to repay their loans, ignored

1   credit scores of High-Interest Private Loan borrowers, lent with far less selectivity, and brushed

2   aside its formerly strict underwriting practices for purposes of dramatically increasing its pool of

3   High-Interest Private Loan borrowers.

4          110.    Sallie Mae has since admitted that, by the end of 2007, 15% of its portfolio

5   consisted of High-Interest Private Loans issued to students who were "poor credit risks" and/or

6   attending the "wrong schools."  Unfortunately, these fundamental and material changes in Sallie

7   Mae's High-Interest Private Loan lending practices were not adequately disclosed to the public

8   until long after Plaintiffs and Class members took out their loans.

9          111.    Only long after Plaintiffs and Class members received their High-Interest Private

10  Loans did Sallie Mae and its executives disclose—in telephone calls with investors that Plaintiffs

11  and Class members were not invited to participate in (and did not participate in)—that Sallie Mae

12  had intentionally and systematically issued High-Interest Private Loans to a group of students

13  (including Plaintiffs and Class members) who were likely to be delinquent and/or default on their

14  loans.  While Sallie Mae previously said that its "tolerance" for High-Interest Private Loan

15  delinquencies was only three percent, in fact the delinquency rates—and expected delinquency

16  rates—for Plaintiffs and Class members was vastly higher.

17         112.    None of this information was disclosed to, or available to, Plaintiffs and Class

18  members when they took out their High-Interest Private Loans.  Only much later did Sallie Mae

19  admit that it had discarded its underwriting standards when issuing High-Interest Private Loans.

20  Only much later did Sallie Mae disclose that it intentionally issued High-Interest Private Loans to

21  low-credit students who attended schools that would not increase their earning capacity, thus

22  miring these students (such as Plaintiffs and Class members) in lifelong debt that, predictably, they

23  never would repay in full.  Only much later did Sallie Mae admit that it did not expect a large

24  percentage of its High-Interest Private Loans to be repaid in full, when those High-Interest Private

25  Loans were issued to students at schools like CCA.  As Sallie Mae's Chairman acknowledged—on

26  a conference call with investors—these loans were "predictably not collectable."

27         113.    At the time that Plaintiffs and Class members received their High-Interest Private

28  Loans, Sallie Mae had not disclosed these vital facts about its true High-Interest Private Loan

underwriting practices and expectations regarding full repayment.  In fact, Sallie Mae had exclusive knowledge of these facts.  Plaintiffs and Class members were ignorant of these facts when they took out their High-Interest Private Loans with Sallie Mae to attend CCA, and Sallie Mae knew that Plaintiffs and Class members were ignorant of these facts at the time.

> **c.  Sallie Mae Was Motivated To Expand Its High-Interest Private Loans Portfolio As Part of a Scheme To Inflate its Value and Stock Prices.**

114.    Sallie Mae had considerable motivation to change certain of its business practices to make it appear—and become—more profitable.  In the face of declining margins in its traditional loan portfolio in the late 1990s, and seeking investors, Sallie Mae felt that it needed to provide a jolt to its business.

115.    More particularly, during the 2000s, Sallie Mae was seeking acquisition bids to become a private company through a leveraged buy-out.  It needed to increase (or at least inflate) its profits to attract investors.  This strategy nearly paid off when Sallie Mae entered into a merger agreement that contemplated its acquisition by J.C. Flowers, Bank of America, and JPMorgan Chase.  The merger agreement contained provisions that would provide many personal benefits for Sallie Mae's highest executives upon completion of the deal, including increased stock prices and significant cash payouts for Sallie Mae's then-Chairman of the Board of Directors, Albert Lord ($225 million), and the company's then-CEO, Charles Andrews ($16.6 million).

116.    Ultimately this merger did not come to pass, as Sallie Mae was unable to allay the concerns expressed by the Flowers group that recent federal legislation would squeeze Sallie Mae's profit margins.

117.    Sallie Mae officially announced the demise of the planned merger on December 12, 2007.  However, the company still managed to profit from the merger exercise.  On January 28, 2008, Sallie Mae dismissed a lawsuit it had brought against the Flowers group over the failed merger in exchange for $31 billion in financing from a consortium of banks led by Bank of America and JPMorgan Chase.

118.    As explained further below, Sallie Mae thus has substantially profited already from its High-Interest Private Loans scheme, which included extending untold numbers of hastily-

1    approved loans to borrowers such as Plaintiffs and Class members, even if Sallie Mae ultimately is

2    unable to recover the full debt owed on the loans from the borrowers themselves.

3          119.     Sallie Mae had another specific, investor-related incentive to increase its High-

4    Interest Private Loans portfolio in an attempt to bolster its apparent (and actual) profits.

5    Specifically, Sallie Mae needed to keep its stock price above certain levels to avoid a multi-billion-

6    dollar contingent liability under a risky financing technique involving the use of equity-forward

7    contracts.

8          120.     Sallie Mae had entered into equity-forward contracts using the Company's securities

9    as a way to raise money without borrowing.  Under these contracts, Sallie Mae sold shares of its

10    stock to the contracts' counterparties at certain prices and agreed to repurchase the shares at a date

11    certain at higher, specified "strike prices."

12          121.     Through the equity-forward contracts, Sallie Mae was able to raise money without

13    taking out a loan or issuing debt or equity.  But Sallie Mae risked substantial financial liability, of

14    course, if the market price of its stock did not reach the strike levels by the time the contracts had

15    to be settled.

16          122.     Under its equity-forward contracts, Sallie Mae was obligated to buy back

17    approximately 48 million shares.  Pursuant to amendments to the contracts, the strike prices ranged

18    from $46.30 to $54.74 per share.  The total potential cash liability (i.e., approximately 48 million

19    shares multiplied by the strike prices) was approximately $2.5 billion.

20          123.     The equity-forward contracts also permitted the counterparties to terminate a portion

21    of the contract and force Sallie Mae to make the resulting stock purchase if the share price of the

22    stock fell below an "initial trigger price."  The counterparties could continue to terminate portions

23    of the contract if the share price fell to successively lower specified levels.  If the share price

24    reached the "final trigger price," the counterparties could terminate the entire contract.

25          124.     The desire to avoid paying $2 billion or more under the equity-forward contracts

26    provided extra motivation for Sallie Mae to keep the market price of its stock relatively high.

27    Sallie Mae had a particularly strong motive to engage in conduct that gave the appearance to

28    investors of both solid and ever-positive financial results.  To that end, Sallie Mae manipulated its

underwriting, financial accounting, and forbearance policies to increase its High-Interest Private Loans portfolio dramatically, bolster its apparent income from that portfolio, and minimize the portfolio's default rates.  Sallie Mae, however, disclosed none of this information, knowing that Plaintiffs and Class members were ignorant of these facts.

### d. Sallie Mae Was Motivated to Expand Its High-Interest Private Loans Portfolio As Part of a Scheme to Inflate Its Longer-Term Profits.

125.    Short-term gain and the appearance of long-term profits, as discussed above, was a strong motivating factor for Sallie Mae to have ratcheted up its High-Interest Private Loan business and to have secretly lowered its underwriting standards for such loans.  But Sallie Mae engaged in this scheme for long-term profits, as well.

126.    Sallie Mae's High-Interest Private Loans typically include much higher interest rates than federal loans, as detailed herein.  Its High-Interest Private Loans also typically include a provision that permits Sallie Mae to capitalize interest after a student misses a certain number of timely payments.  Accordingly, it is not uncommon for a student who took out $40,000 in a Sallie Mae High-Interest Private Loan to have an outstanding balance in excess of $100,000.

127.    In all-too-common circumstances, a student may make regular payments that do not even cover the escalating interest payments.  For instance, a student could take out a $40,000 High-Interest Private Loan with interest rates of approximately 10%, make payments to Sallie Mae of $400/month for 100 months (totaling $40,000), and, at the end of those 100 months, owe Sallie Mae another $75,000 for full repayment of the loan.  High-Interest Private Loans thus allow Sallie Mae to turn a handsome profit, even on High-Interest Private Loans for students who end up being unable to repay their loan in full.

128.    Sallie Mae thus had a profit incentive to issue High-Interest Private Loans, even when it knew the students were very unlikely to be able to repay their loans in full.  Sallie Mae could profit from issuing High-Interest Private Loans to groups of students, like Plaintiffs and Class members, whom Sallie Mae largely expected to be unable to repay their loans in full.  Once Sallie Mae had turned a profit, it was in a better financial position, while its borrowers were left with ruined credit scores and a lifetime of debts that only increase over time.

12330

129.   Sallie Mae concealed from Plaintiffs and Class members the true facts regarding its pattern of, and expectation to, capitalize on the interest from the High-Interest Private Loans as part of a regular business practice.

**e.   Sallie Mae Generates Further Profits and Hides Its High-Interest Private Loan Strategies By Relaxing Its Forbearance Practices.**

130.   As part of its scheme to bolster its profits during the 2000s, Sallie Mae increased its use of forbearances.  Granting a greater number of forbearances for its High-Interest Private Loan borrowers—a break from its prior policy—allowed Sallie Mae to report more income and hide what, at that point, only Sallie Mae knew: its expanded pool of High-Interest Private Loan borrowers, particularly those at for-profit schools such as CCA, were unable to pay off their loans at alarming rates.

131.   Forbearance allows a High-Interest Private Loan borrower, for a fee, to make no payments on a loan for a specified period of time.  The term of the loan is extended by the duration of the forbearance period.  During forbearance, interest accrues and is added to the amount owed by the borrower.  Sallie Mae even recorded this accruing interest as income.

132.   In public disclosures, Sallie Mae said that it categorized delinquent High-Interest Private Loans in 30-day groups, with the final group being those High-Interest Private Loans that were between 180 and 212 days delinquent.  After 212 days of non-payment, Sallie Mae would charge-off a delinquent loan as defaulted.  Sallie Mae's delinquency and charge-off rates had a material effect on its financial results, as the higher those rates, the higher the company's requisite allowance for High-Interest Private Loan losses, thus reducing reported income and earnings.

133.   Sallie Mae's policy was to treat all loans in forbearance and exiting forbearance as "current," regardless of how delinquent it had been.  Granting forbearance on past-due loans therefore enabled Sallie Mae to avoid the negative financial consequences of reporting High-Interest Private Loans as delinquent or defaulted.  Thus, even if a loan was 180+ days delinquent when it entered forbearance, that loan still would be classified as "current" on Sallie Mae's financial statements during the forbearance period and upon entering repayment.  As an added bonus, Sallie Mae's practice of granting such forbearances in the mid-to-late 2000s allowed the

12330

company to record millions of dollars of accruing additional interest as profit.

134.    Sallie Mae's newly relaxed forbearance policy also allowed it to further cover up its 2000s-era High-Interest Private Loan practices and the staggering number of High-Interest Private Loan borrowers whom Sallie Mae otherwise would have reported as delinquent or in default.  Had Sallie Mae disclosed its High-Interest Private Loan policies and consequential delinquencies and/or defaults, its investors would have demanded an end to the risky lending and a return to the conservative approach that did not include issuing High-Interest Private Loans to students at schools like CCA.

135.    Sallie Mae represented in SEC filings, at all times relevant, that it had well-established forbearance practices for High-Interest Private Loans, that borrowers who were granted forbearance were screened to ensure that forbearance would improve their ability to repay, that Sallie Mae's forbearance practices increased the likelihood of repayments, and that these practices were a positive collection tool for Sallie Mae.  For example, Sallie Mae's 2006 10-K stated, in relevant part, as follows:

> For borrowers that need more time or experience other hardships, we permit additional delays in payment or partial payments. . . when we believe additional time will improve the borrowers' ability to repay the loan.  Forbearance is also granted. . . when we believe that it will increase the likelihood of ultimate collection of the loan. . . . Exceptions to forbearance policies are permitted in limited circumstances and only when such exceptions are judged to increase the likelihood of ultimate collection of the loan.

136.    When asked about Sallie Mae's High-Interest Private Loan forbearance practices on a January 18, 2007, conference call with investors, former Sallie Mae CEO Charles Andrews stated: "we monitor that very closely."  Andrews reiterated this point during a subsequent conference call with investors in October of that same year, saying: "it's a conscious decision whether a loan goes into forbearance" and "we monitor it closely."

137.    Other examples abound.  For instance, in its 2006 (first quarter) earnings call, CFO Andrews unequivocally stated that "we diligently drill down and. . . make sure that forbearance is being used for [the] right reasons, for the right purposes that are conducive to enhancing ultimately the collection of the [loan]."

138.     In fact, however, Sallie Mae was not complying with the forbearance practices it described during such calls and in SEC filings.  Rather, it routinely granted borrowers forbearance, sometimes repeatedly, without screening to ensure that forbearance would improve their ability to repay the loans.  Sallie Mae's actual forbearance practices for High-Interest Private Loans during the mid- to late-2000s did not require an increase in the likelihood of repayment and were not necessarily a positive collection tool.  Instead, Sallie Mae used forbearance as a means to keep loans out of delinquent status, often without regard to the borrowers' ability to repay the loans.  It did so, at least in part, for the purpose of reducing reported loan delinquencies and defaults, which allowed Sallie Mae to reduce its allowance for High-Interest Private Loan losses.  Reducing its High-Interest Private Loan loss allowance, in turn, permitted Sallie Mae to increase its reported income and earnings, record additional interest income, and cover up the fact that a significant percentage of students in Sallie Mae's new High-Interest Private Loan borrower pool were drowning.  Sallie Mae stated none of this to Plaintiffs and Class members, who remained obviously ignorant of these facts.

139.     Senior Sallie Mae executives later admitted—in phone calls with investors—that Sallie Mae's forbearance practices during this time period had failed to adequately screen borrowers who were granted forbearance, that forbearance did not increase the likelihood of repayment of the loans, and that the effect of Sallie Mae's practice of granting forbearances in violation of its own stated criteria was to reduce Sallie Mae's delinquency and default rates only in the short term, because the indiscriminate granting of forbearance merely delayed the inevitable delinquency and default for many borrowers.

140.     In sum, the net effect of Sallie Mae's secret forbearance policies was to inflate the company's reported income and to substantially understate the rates at which High-Interest Private Loan debtors were unable to repay their loans.

///

///

///

///

**f.    Sallie Mae Concealed From Plaintiffs and Class members the True Facts Regarding Its Forbearance Policies and How Its Practices Distorted Its Delinquency and Default Rates.**

141.    As alleged above and below, Sallie Mae lied to investors about its High-Interest Private Loan lending practices and its expectations of full High-Interest Private Loan repayment for students who went to schools like CCA.  While Sallie Mae was misleading investors concerning High Interest Private Loan repayment, it was, in fact, carefully analyzing the dropout, delinquency, default, and unemployment rates associated with schools like CCA.

142.    Sallie Mae regularly performs a detailed analysis of the default rates of its private student loans in numerous ways and for numerous purposes.  For example, Sallie Mae maintains an allowance for loan losses "at an amount sufficient to absorb losses in our FFELP loan and Private Education Loan portfolios at the reporting date based on a projection of estimated probable credit losses incurred in the portfolio."  (Sallie Mae 2009 10K at 26.)  "When calculating the allowance for loan losses on Private Education Loans, we divide the portfolio into categories of similar risk characteristics based on loan program type, loan status (in-school, grace, forbearance, repayment and delinquency), underwriting criteria (FICO scores), and existence or absence of a cosigner."  (*Id.* at 26.)  Sallie Mae also uses "historical experience of borrower default behavior and charge-offs to estimate the probable credit losses incurred in the loan portfolio at the reporting date."  (*Id.*)  Sallie Mae also uses "projection modeling" and subjective review of the projections that take into account "historical experience."  (*Id.* at 26-27.)  Sallie Mae has regularly performed this analysis for years. (*See* 2006 10-K at 35 (describing similar analysis).)

143.    Sallie Mae also analyzes the default rates on its loans in preparing its consolidated balance sheet and financial statements pursuant to accepted accounting standards.  For example, Sallie Mae reports the "income on our student loan portfolio based on the expected yield over the estimated life of the student loan after giving effect to the amortization of purchase premiums and accretion of student loan discounts."  (2009 10K at 28.)  In doing so, Sallie Mae uses a "Constant Prepayment Rate" ("CPR"), which "measures the rate at which loans in the portfolio pay down principal compared to their stated terms."  (*Id.*)  "The CPR estimate is based

12330

on historical prepayments due to consolidation activity, defaults, and term extensions from the utilization of forbearance as well as management's qualitative expectation of future prepayments and term extensions." (*Id.*)

144.    Sallie Mae further analyzes the default rates of its student loans when reporting the "fair value" of its "residual interests" in its student loans and the student loans themselves in accordance with various accounting standards.  For example, Sallie Mae uses "the most current prepayment and default rate assumptions to project the cash flows used to value Residual Interests." (*Id.* at 30.)  "These assumptions are internally developed and primarily based on analyzing the actual results of loan performance from past periods." (*Id.*)  Similarly, in determining the "fair value" of its student loans, Sallie Mae uses "internally-developed assumptions to determine aggregate portfolio yield, net present value and average life." (*Id.* at 31.)  Two of the four "significant assumptions used to project cash flows" are "prepayment speeds" and "default rates." (*Id.*)  Sallie Mae noted that such "[s]ignficant inputs into the models are not generally market observable," and "derived internally through a combination of historical experience and management's qualitative expectation of future performance." (*Id.*)

145.    Sallie Mae uses the default rates of its student loans when deciding which loans to allow to enter into forbearance.  "We combine borrower information with a risk-based segmentation model to assist in our decision making as to who will be granted borrower forbearance based on our expectation as to a borrower's ability and willingness to repay their obligation." (*Id.* at 70.)

146.    Sallie Mae also regularly analyzes the delinquency and default rates for its student loans by distinguishing between "traditional" and "non-traditional" loans.  (*See id.* at 69-70.)  The difference in default rates between "traditional" and "non-traditional" loans has been dramatic and consistent.  For example, Sallie Mae's reported "charge-offs as a percentage of average loans in repayment" for 2007 was 1.2% for traditional loans and 9.5% for non-traditional loans.  For 2008, this increased to 1.4% and 11.4%, respectively, and increased more, in 2009, to 3.6% to 21.4%.  (*Id.* at 69.)  Similarly, the "delinquencies as a percentage of private student loans in repayment" for 2007 was 5.2% for traditional loans and 26.3% for non-traditional loans.

(*Id.*)  This increased in 2008 to 7.1% for traditional and 28.9% and non-traditional, and again in 2009 to 9.5% and 31.4%, respectively.  (*Id.*)

147.    Sallie Mae also "regularly engage[s] in securitization transactions as part of [its] Lending segment financing strategy."  (2009 10K at 31.)  As part of this securitization, Sallie Mae "sell[s] student loans to a trust that issues bonds backed by the student loans as part of the transaction."  (*Id.*)  In doing so, Sallie Mae regularly estimates the "fair value" of the "residual interests" of each of its student loans, which is the right to receive cash flows from these loans. (*Id.*)  In doing so, Sallie Mae regularly estimates the "expected credit losses" from each of these loans using "a life of loan default rate."  (*Id.*)  The "life of loan default rate" is "used to determine the percentage of the loan's original balance that will default."  (*Id.*)

148.    Later, officials at Sallie Mae in 2010 admitted publicly that they had compared the default rates of a group of borrowers with credit scores of 700, and found that the chances of such a student defaulting can vary by as much as 30 percent "depending on which school the student attends."

149.    In fact, Plaintiffs are informed and believe:  (1) That at all relevant times Sallie Mae collected, recorded, and analyzed data regarding private student delinquency, default, dropout, and unemployment rates for each school its borrowers attended; (2) that this information was a primary factor in determining, *inter alia,* the Margin for the Variable Rate of interest applied to the High-Interest Private Loans; and (3) the Variable Rate assessed to each applicant was commensurate with the applicant's probability of failing to timely repay the loan.

150.    Only Sallie Mae had the underwriting information at issue, the data that led it to conclude the risk of default on these loans was unprofitably high.  But Sallie Mae did not provide borrowers with information on borrower default rates and delinquency rates for CCA, information that Sallie Mae had readily available and regularly consulted when assessing a borrower's loan interest rate.

151.    Sallie Mae did not and currently does not reveal or publish this delinquency and default information for any individual schools in any public forum.  The only references to the

12330

1    data collection and analysis are deeply buried in Sallie Mae's annual 10-K SEC filings intended

2    for Sallie Mae shareholders', and not borrowers', review.

3        152.    In fact, Salle Mae's only reference to student loan rate disparities between schools

4    was the disparity between "Traditional" school loans and "Non-Traditional" school loans—a

5    distinction it first began publishing in its 2009 form 10-K.  Prior to that 2009 release, Sallie Mae

6    masked any difference in default rates between schools whatsoever by only releasing a single

7    data category, "Delinquencies as a percentage of Private Education Loans in Repayment."  Sallie

8    Mae did not publicly publish any data or information regarding the true risk that a borrower

9    would run from entering into a High-Interest Private Loan to attend CCA.

10       153.    Indeed, as the 2012 HELP Report noted, "[c]onsistent and comprehensive

11   institutional-level information tracking for-profit college student retention and graduation rates is

12   not regularly available.  The colleges themselves do not voluntarily disclose this information,

13   and the measurements the Department of Education collects and publishes are lacking in . . . key

14   respects."  Senate HELP Rpt. at 72-73.

15       154.    Sallie Mae had ample opportunity to disclose the default rates and other material

16   facts to borrowers of their loans.  In compliance with the Truth in Lending Act, Sallie Mae was

17   required to send documents to borrowers prior to disbursement of funds.  Defendant had the

18   opportunity to, but did not, make this material disclosure at that or any other time.

19       155.    These default rates were material.  Indeed, Sallie Mae admitted in an investment

20   conference in March of 2010 that the best predictor of whether a student loan would default is

21   the school the student attends.  Sallie Mae admitted that the "key" to determining a likelihood of

22   default was the school, and its accompanying track record in terms of graduation rates and

23   education.  Sallie Mae even compared the default rates of a group of borrowers with the same

24   credit score, finding that the chances of such a student defaulting can vary by as much as 30

25   percent "depending on what school that student attends."

26       156.    Unfortunately for Plaintiffs, in this case, the "school that the student attends" was

27   CCA.  Unfortunately for Plaintiffs, CCA had engaged in extensive fraudulent activity to

28   convince students to attend, including misrepresentations about and non-disclosures concerning

extremely student high default rates.  Unfortunately for Plaintiffs, Sallie Mae knew this, but nonetheless continued to peddle these loans to Plaintiffs, thereby trapping Plaintiffs in crushing, ever-increasing debt.

157.    While Sallie Mae had known about the high default rates associated with the High-Interest Private Loans for some time, its knowledge that the students entering into these loans were going to be unlikely to repay them only started coming to light in 2008, when Sallie Mae's CEO, Albert Lord, participated in a conference call with investors.  During this call, Lord began to reveal some of the truth about Sallie Mae's financial condition and its knowledge of the significant problems associated with the High-Interest Private Loans provided in connection with the For-Profit, High-Risk Schools.

158.    Lord stated that Sallie Mae would increase its provision for loan losses from High-Interest Private Loans and that he was not optimistic about full repayment of a significant portion of High-Interest Private Loans that Sallie Mae issued to low-credit borrowers and borrowers who attended certain proprietary schools, such as the For-Profit, High-Risk Schools. For the first time, Lord also hinted that Sallie Mae had known for some time that a significant percentage of its High-Interest Private Loans borrowers would default.

159.    During a subsequent conference call, Lord admitted that for the past several years, Sallie Mae had been issuing risky High-Interest Private Loans, in violation of its own lending policy; that Sallie Mae had lent too much money to students at certain proprietary schools, and that these loans were "predictably not collectible."

160.    Also during this conference call, Sallie Mae executive John Remondi expanded on and provided more detail concerning Sallie Mae's previously undisclosed non-traditional lending practices, stating in relevant part as follows:

> The bulk of the [loan loss] reserve[,] though[,] was driven by the private credit portfolio with a $961 million increase in the private loan provision. . . . This increase was driven by . . . default trends in a very limited segment of our overall portfolio[;] it's a portfolio that we'll refer to as our non-traditional loans.  These are loans that are made to lower tier credit borrowers and are attending for the most part schools that have a different profile than other institutions, mostly due to the types of degrees that they offer, more associate versus bachelor's as well as the type of students that attend those institutions.

12330

This is really a segment of the schools that for one reason or another are bringing in students but not producing graduates. Or if they are producing graduates, their graduates haven't gained a sufficient economic benefit to generate the earnings to pay off and meet the debt obligations associated with their loan. And that's the business that we will be exiting.

*     *     *

You can see how much higher not only are delinquency rates associated with these loans, which run more than six times higher than the delinquency rates of our traditional loan portfolios. And these are delinquencies over 90 days. But that they also experience even higher defaults or charge off rates. These loans defaulted at almost eight times the rate we see in the traditional portfolio.

*     *     *

We will . . . exit the low tier credit components of our private credit portfolio and those non-traditional schools where the schools are not generating graduates or generating the economic benefit for graduates. . . . We expect to improve the profitability of our lending [in part] by . . . exiting those schools where we have no business making loans to students.

161.    During the same call, Remondi bluntly admitted that, during the time that Plaintiffs and Class members took out their High-Interest Private Loans, Sallie Mae secretly aimed to issue a large volume of High-Interest Private Loans, often at the expense of the ability of its borrowers to repay the loans in full. According to Remondi, Sallie Mae's High-Interest Private Loan origination practice during those years "focused more on volume, less on quality."

162.    On a follow-up conference call with investors, Remondi acknowledged that prior to 2008 Sallie Mae had increased its use of forbearance, but that the company had since reverted to its earlier practice of allowing forbearances only when justified after conducting an individualized analysis of the borrower's potential for future repayment of his or her High-Interest Private Loan.

163.    Later, Sallie Mae CEO Lord spoke at the Lehman Brothers Global Financial Services Conference, where he admitted that Sallie Mae did not have adequate underwriting practices for non-traditional loans during the period that Plaintiffs and Class members took out their High-Interest Private Loans. Lord conceded:

We don't think we help anybody [when] we lend to somebody that in the end doesn't get an education and then ends up saddled with debt. . . . We shouldn't have

non-traditional borrowers, but we do. In fact about 15% of our portfolio are what we call non-traditional borrowers. . . . It's basically kids and parents with poor credit risks who are at the wrong schools. . . .

164.   In the years since, much of this portfolio has proven to be highly toxic. A Sallie Mae official, remarking on the company's 2009 financial metrics during a conference call, stated that 24% of Sallie Mae's private loans to students attending "non-traditional schools," such as the For-Profit, High-Risk Schools, had been charged off. Moreover, while only 13% of Sallie Mae's private student loans in repayment were issued to students who attended non-traditional schools, those loans accounted for a whopping 50% of all charge-offs. During the call, Lord acknowledged that Sallie Mae's non-traditional private loans represented only one-sixth of Sallie Mae's loan portfolio, but approximately half of all of its credit losses.

165.   Similarly, in an investor conference in March 2010, Sallie Mae officials revealed that of the approximately $6 billion of sub-prime private loans the company made to students at these schools, about 40 percent have gone into default. In comparison, only about 4 percent of the $33 billion in private loans Sallie Mae has made to students at traditional colleges have defaulted.

166.   In January 2012, a federal judge in the Southern District of New York certified a class of Sallie Mae's investors who had filed a complaint alleging that certain of the allegations repeated in this Complaint violated securities laws.

167.   Plaintiffs and Class members had no actual or presumptive knowledge, prior to 2012, of the facts giving rise to Sallie Mae's liability. Nor were Plaintiffs or Class members negligent in failing to discover such facts, as those facts were not reasonably discoverable to Plaintiffs and Class members prior to this time. To the extent that Sallie Mae revealed any of the information that gives rise to its liability, as alleged in this Complaint, it did so only relatively recently and in fora where Plaintiffs and Class members were not present and would not be expected to be present. In fact, Plaintiffs and Class members did not have actual or constructive knowledge of many of the allegations giving rise to Defendants' liability—nor could they be expected to have acquired such knowledge—prior to the undersigned counsel's comprehensive investigation into the matters detailed in this Complaint.

**g.    Sallie Mae Repeatedly Touted Its Close Working Relationship With For-Profit Schools Like CCA.**

168.    Sallie Mae worked closely for years with CCA.  Its business practices have recently come under increased scrutiny due to government investigations and the HELP Report issued in July of 2012.  These business practices include (a) aggressive, misleading, and fraudulent sales techniques that target the poorest and most vulnerable students and families; (b) pricing strategies designed to capture the entirety of available federally-guaranteed student loans as well as thousands of dollars in high-interest private student loans; and (c) contrary to these schools' express representations to these students and their families, negligible investment and effort in the actual education and career-placement of the unfortunate students that take out loans to attend their classes.

169.    As the HELP Report and other recent studies have concluded, these practices have resulted in, inter alia, (1) student populations at these schools which consist nearly entirely of students using a combination of federally-guaranteed student loans and high-interest private student loans and (2) consistent, extremely high loan delinquency, loan default, course drop-out, and unemployment rates.

170.    Sallie Mae knew about CCA's business practices, at all times relevant, referenced in this complaint because it was well aware of the abysmal job placement and loan repayment rates of CCA graduates and because it worked closely with CCA to sell the High-Interest Private Loans.  As Sallie Mae explained in its 2008 10-K, "Our sales force is the largest in the student loan industry. The core of our marketing strategy is to generate student loan originations by promoting our brands on campus through the financial aid office."  (2008 10K at 2.)  It explained:  "[o]ur primary marketing point-of-contact is the school's financial aid office."  (*Id.* at 7.)  Sallie Mae would become "lending partners" with national or regional banks; Sallie Mae's sales force would "promote their brands on campuses and we purchased the loans after disbursement."  (*Id.*).  Beginning in 2008, Sallie Mae would simply market its "internal brands" on campus and market to these schools and their students directly.  (*Id.*)

12330

171. Indeed, Sallie Mae stated in its 2006 10-K: "Our primary marketing point-of-contact is the school's financial aid office . . . . Our sales force . . . **works with financial aid administrators on a daily basis** . . . ." (2006 10-K at 12.)

172. As Sallie Mae explained: "Since 1999, we have partnered with over 300 schools that have chosen to return to the FFELP from the FDLP. Our FFELP originations at these schools totaled over $2.1 billion in 2006. In addition to winning new schools, we have also forged broader relationships with many of our existing school clients. Our FFELP and private originations at for-profit schools have grown faster than at traditional higher education schools due to enrollment trends as well as our increased market share of lending to these institutions." (*Id.*)

173. This close working relationship was heightened when it came to the private student loans issued by Sallie Mae to for-profit schools such as CCA. As Sallie Mae explained in its 2005, 2006, and 2007 10-Ks: "Private Education Loans are often packaged as supplemental or companion products to FFELP loans and priced and underwritten competitively to provide additional value for our school relationships. In certain situations, a for-profit school shares the borrower credit risk." (*Id.* at 13-14.) As CEC has admitted, Sallie Mae and CEC had such an agreement up until March 2008, in the form of a "recourse loan" agreement whereby CEC agreed to actually "repurchase loans originated by [Sallie Mae] to our students after a certain period of time." (CEC 2011 10-K at 121.)

**IV. PLAINTIFFS AND CLASS MEMBERS NEVER WOULD HAVE CONTRACTED WITH SALLIE MAE FOR HIGH-INTEREST PRIVATE LOANS TO FINANCE THEIR CCA EDUCATION IF SALLIE MAE HAD AT THE TIME DISCLOSED THE TRUTH.**

174. As described above, in the late 1990s and/or early 2000s, Sallie Mae engaged in a multi-faceted strategy to inflate its own profits and stock prices. It did so by increasing its High-Interest Private Loans portfolio through relaxed underwriting policies and extending these loans to risky borrowers, or students with low credit scores who attended the "wrong schools" and/or students who were not expected to make enough money upon graduation to ever repay their loans. Plaintiffs and their fellow Class members are the paradigmatic example of such risky borrowers.

12330

175.     Ignoring the financial burden its actions placed on borrowers, Sallie Mae blithely extended loans it never expected to be repaid fully—all for the purpose of manipulating its financial reports and increasing its revenue.  Sallie Mae was fully aware that a large percentage of Plaintiffs and Class members were unable to repay their High-Interest Private Loans in full—and it knew for a fact that a large percentage of CCA students were becoming delinquent and defaulting on their loans and accordingly racking up tens of thousands of dollars in late-payment and interest charges.  Yet it intentionally failed to disclose this highly relevant information to Plaintiffs and Class members at the time that it issued their High-Interest Private Loans.  It further took pains, as described in this Complaint, to hide from the public its practices and its High-Interest Private Loan portfolio's weaknesses.

176.     If not for this secret scheme, Sallie Mae never would have extended High-Interest Private Loans to Plaintiffs and Class members.  This is true for at least two reasons:  First, had Sallie Mae disclosed at the outset that it planned to issue High-Interest Private Loans to low-credit students and/or students who went to schools that would not increase their students' wage potential—and that it thus expected much higher delinquencies and defaults than usual—Sallie Mae's shareholders would not have permitted it to issue High-Interest Private Loans to borrowers like Plaintiffs and Class members.  This was at least part of the reason, after all, that Sallie Mae kept its High-Interest Private Loan scheme a secret during the time that Plaintiffs and Class members received High-Interest Private Loans from Sallie Mae to attend CCA.  Second, had Sallie Mae truthfully disclosed its understanding of Plaintiffs' and Class members' delinquency and default rates—leading to long periods of stressful, painful debt and high rates of permanent insolvency—as well as the historical default and delinquency rates for CCA students upon which Sallie Mae relied in calculating its high-risk interest rates, Plaintiffs and Class members would not have entered into the High-Interest Private Loans in the first place.

**V. SALLIE MAE IS, AND HAS ALWAYS BEEN, THE OTHER CONTRACTING PARTY ON THE PLAINTIFFS' HIGH-INTEREST PRIVATE LOANS, DESPITE LANGUAGE ON THE PROMISSORY NOTES IDENTIFYING AN OKLAHOMA BANK AS THE "LENDER."**

177.     Sallie Mae drafted the High-Interest Private Loans at issue in this case.  These loans,

12330

however, provided that the lender was Stillwater National Bank ("Stillwater").  Nonetheless, Sallie Mae was, and always has been, the actual lender.

178.    Sallie Mae attempts to avoid direct liability on the loan agreements by making it appear as if the loans are made by a national bank.  According to the terms of the Sallie Mae-drafted promissory note, the loan contract is between the students and Stillwater.

179.    However, this is a fiction.  Sallie Mae developed and marketed Plaintiffs' and Class members' High-Interest Private Loans, and Sallie Mae created and copyrighted the loan application forms and promissory notes.  Plaintiffs and Class members, per Sallie Mae's instructions on the application forms and promissory notes, returned the loan applications to Sallie Mae and then made all payments to Sallie Mae.  Moreover, Sallie Mae provided the funding for the High-Interest Private Loans, directly and/or indirectly through such means as credit extensions and forward purchase agreements, and Sallie Mae directed and controlled the disbursement of the loan proceeds, just as it insured the loans.  In short, Sallie Mae is the de facto actual lender of Plaintiffs' and Class members' High-Interest Private Loans and is properly seen as the original counterparty to those notes.

180.    Furthermore, Sallie Mae includes a one-sided assignment clause in its promissory notes.  By advance agreement and understanding, Stillwater assigned the loan contracts to Sallie Mae, which allowed Sallie Mae to administer the loans and enforce the contracts.  In effect, Stillwater monetized its state bank charter by allowing its name to be used by Sallie Mae; Sallie Mae paid Stillwater to use the name of the bank in an attempt to avoid direct liability.  At all times relevant to this Complaint, however, Sallie Mae was, and is, the de facto lender.

181.    The 10-K filed for 2010 by Southwest Bancorp Inc. (Stillwater's parent company) admitted: "[S]tudent lending . . . is substantially dependent on Student Loan Marketing Administration ("Sallie Mae"), which provides substantially all of the servicing for government guaranteed and private student loans and provides liquidity through its purchases of student loans and lines of credit. . . . As of December 31, 2010, all private student loans were self-insured by Sallie Mae."

182.    Stillwater has no true role or relationship to the loans that are made by Sallie Mae in

12330

Stillwater's name, other than maintaining bank accounts from which Sallie Mae can issue disbursements and/or be reimbursed for the money it disburses directly to students.  Sallie Mae provided Stillwater with lines of credit that it can draw upon for the purpose of funding such loans. Moreover, because Stillwater transfers the High-Interest Private Loans to Sallie Mae after origination under a pre-arranged agreement as described herein, Stillwater never truly undertakes any risk of loss.

183.    Sallie Mae bears the credit risk on all the High-Interest Private Loans.  Sallie Mae insures and/or guarantees the High-Interest Private Loans so that Sallie Mae bears the risk of loss on the loans even prior to purchasing them.  Sallie Mae then assumes the risk of loss directly when it executes the assignments of the High-Interest Private Loans pursuant to the forward purchase agreements.

184.    Sallie Mae has exerted all control and ownership over Plaintiffs' and Class members' High-Interest Private Loans in other ways, as well.  Sallie Mae carried out all lender-side interactions with the borrowers applying for the High-Interest Private Loans.  Sallie Mae also established and controlled the terms and conditions under which the High-Interest Private Loans are offered.  Sallie Mae approved or denied borrowers' High-Interest Private Loan applications, used its own copyrighted forms, promissory notes, brands and platforms, and disbursed the payments to Plaintiffs and Class members—whom Sallie Mae approved for its High-Interest Private Loans.

185.    In reality, Sallie Mae is the lender for its High-Interest Private Loans.  Sallie Mae owns and markets the High-Interest Private Loan brands, and it underwrites the loans, directs the terms of the loans, funds the loans directly or indirectly, does all the work to service the loans, bears the credit risk, and reaps most or all of the fees and profits from the High-Interest Private Loans.

186.    Accordingly, at the time that the High-Interest Private Loans at issue were made to the Plaintiffs and Class members, Sallie Mae, not Stillwater (or any other bank), was the actual counterparty to the High-Interest Private Loans issued to Plaintiffs and Class members.

///

**ALLEGATIONS SPECIFIC TO PLAINTIFF ANDREW BRADSHAW**

187.     Plaintiff Andrew Bradshaw was recruited to attend CCA over the summer and early fall of 2004, and completed an application for admission into CCA's program for a "Certificate in Baking & Pastry Arts" on September 7, 2004.

188.     In deciding to attend CCA, Andrew relied on statements and representations by a CCA admissions representative in June or July of 2004 concerning (1) CCA's alleged employment network and resources for graduates; (2) CCA's graduates' high rates of employment and income levels; and (3) CCA's graduates' ability to repay the loans necessary to attend CCA. He also viewed a promotional video that CCA sent him containing similar statements and representations.

189.     As part of the recruitment process, during September 2004, Andrew spoke with a "financial aid" officer of CCA on the phone.  The "financial aid" officer of CCA provided Andrew with a document titled "CEC Signature Loan Application and Promissory Note," which bore Sallie Mae's name at the top of the document next to CEC (hereinafter, "Form Promissory Note").

190.     The financial aid officer told Andrew what his monthly payments would be and assured him he would easily be able to pay them.  Based on representations that CCA made to Andrew regarding what his likely income would be after graduating, Andrew believed he would be making more than enough money to cover his loan payments and basic living expenses.

191.     Sallie Mae created the Promissory Note and sent it to CEC for CEC for CEC's recruiters and financial aid officers to use in their recruitment of CEC students.

192.     During this call, Andrew provided the financial aid officer his information so the officer could fill out a Form Promissory Note on his behalf.  The officer did so and then sent it to Andrew for his signature.  The loan amount listed was for $31,000.  This was Sallie Mae's High-Interest Private Loan.

193.     The Form Promissory Note is labeled "School Copy" at the bottom of the form.  In the left-hand lower corner, the term "CEC print" is listed.  In the right-hand lower corner, there is a box provided "Certification Sent Electronically."

194.     The Form Promissory Note was designed by Sallie Mae and CEC to allow for CEC recruiters to quickly "sign up" students for Sallie Mae High-Interest Private Loans during such

12330

1   meetings and to encourage students to enter into these loans as part of CEC's high-pressure

2   recruiting process.

3       195.    Andrew met again with CCA "Financial Aid" officers on or about October 10,

4   2004. During this meeting, CCA provided Andrew with a document titled "California Culinary

5   Academy Student Loan Entrance Interview," dated October 10, 2004, which specifically required

6   him to check a box stating "I have a maximum of 10 years to repay my loan(s) (unless my loans

7   are consolidated)."

8       196.    CCA also prepared a "budget worksheet" for Andrew dated October 11, 2004,

9   listing the total tuition and fees for which Andrew sought student loans. Andrew also filled out a

10  "loan reference form" provided by CCA. CCA then provided him with a letter dated October 11,

11  2004, listing financial aid "awards" to pay for CCA's tuition and other charges. While they were

12  titled "awards," they were all loans.

13      197.    The majority ($23,268) was simply titled "Alternative Loan." This was the High-

14  Interest Private Loan provided by Sallie Mae. CCA subsequently revised this letter on at least two

15  additional occasions, varying the amount of the "Alternative Loan" based on Andrew's eligibility

16  for federal loans. Eventually, the "Alternative Loan" amount rose to $24,600.

17      198.    On information and belief, CCA then worked directly with Sallie Mae to lower the

18  total amount borrowed from $31,000 to $24,600. Thus, on October 13, 2004, Sallie Mae sent

19  Andrew a letter, stating: "[w]e received notification from your school that you would like to apply

20  for a student loan." The letter enclosed a "Federal Stafford Loan Master Promissory Note,

21  Instructions, and Notices, and a Borrower's Rights and Responsibilities."

22      199.    CCA and CEC were acting with Sallie Mae in arranging for the High-Interest

23  Private Loans for Andrew, the other Plaintiffs, and the Class members.

24      200.    Andrew believed that since Sallie Mae routinely supported CCA through financial

25  aid, it must know the earnings potential of CCA graduates. He also assumed that Sallie Mae knew

26  what his earnings potential would be once he graduated and that Sallie Mae would not have

27  extended the loan unless it believed he would be able to repay it.

28      201.    Andrew did not know much about the student loan industry when he took out his

12330

loans.  He believed that all of his financial aid came from Sallie Mae as one package.  He did not understand that the Stafford loans he took out were subject to different regulations and rules than the High-Interest Private Loan.

### ALLEGATIONS SPECIFIC TO PLAINTIFF TANIF STEPHENSON

202.    Tanif Stephenson first considered attending CCA in the Spring of 2003.  She found CCA's website after searching for culinary schools in her area through an Internet search engine.  She liked what she saw on CCA's website, and filled out a web-form indicating she wanted to receive more information.  The next day she received a call from a female CCA admissions officer, who told her that going to CCA was a wonderful opportunity.  During that call, the officer signed her up for a tour of the school.

203.    Tanif first went to CCA's San Francisco campus in or around March of 2003.  During that visit she had a one-on-one tour led by another female CCA admissions officer.  She discussed with the officer—and later that day ultimately signed up for—CCA's Baking and Pastry program.  The seven-month program started in May and culminated in December of 2004.

204.    During her in-person tour, the CCA admissions representative discussed with Tanif all of the exciting opportunities she would have as a CCA graduate.  When Tanif explained she had an interest in teaching, the representative assured her that she would be able to get a teaching job in the culinary industry with her CCA degree.  The representative made CCA sound like a glamorous, world-class culinary institute, mentioning as evidence of the program's value and exclusivity the fact that Harrison Ford's son, Benjamin, was a Cordon Blue graduate.  The representative also told her that CCA would help her find a job, and that she would make "plenty" of money once she graduated.

205.    That same day, and before she filled out her admissions application, the admissions representative gave Tanif a pamphlet that detailed some of the career options she would have after graduation.  Tanif recalls that the pamphlet included a profile of another CCA graduate who had successfully opened her own bakery.

206.    In deciding to enroll at CCA, Tanif relied on representations made on the CCA website, in the career-opportunity pamphlet, as well as by both the admissions representative she

12330

spoke to on the phone and the admissions representative she spoke to during her tour.  Through these representations, CCA gave her the impression that it was a very reputable culinary school, admissions standards were tight, she would have many career opportunities once she graduated, and that she would make more than enough to pay off the tuition loans she needed to finance her tuition.  The mention of Benjamin Ford in particular lent an air of the high-life: she was sure that she would make plenty of money with a CCA degree.  She believed the touring admissions representative's representations that she would be proficiently trained in the culinary field and that CCA would, as it proclaimed, help her find work in the field.  No one ever told her that she might not be able to find work or make her loan payments.

207.    After the tour, but on the same day, the CCA admissions representative asked her for an application fee of around $250-300.  Tanif went to an ATM to get a cash advance on her credit card.  She filled out the application in the admissions office after getting the cash advance and was informed on the spot that she was accepted for the "exclusive" program.  That same day she was also measured for her chef's uniform.  It was all very exciting for her.

208.    Tanif visited the CCA financial aid office a few weeks later, right before her classes were set to begin.  There, a female financial aid officer told Tanif the total cost of the program and explained she could take out loans to cover this cost.  While Tanif sat there, the representative took her information and entered it into an online Sallie Mae loan application.  Upon completing the application, the representative immediately told Tanif that she had been approved for the loans she needed.

209.    When signing Tanif up for her loan package, the financial aid officer did not present Tanif with any options regarding which lender she could apply to for her loans.  Rather, she was told and understood that the Sallie Mae application was "the" application.  It was presented on a take-it-or-leave-it basis.  She had no idea at the time that she could have used another lender.

210.    After the loan application was approved, the financial aid officer went over the basic terms with Tanif but did not tell her how much money her monthly payments would be.  She did not find out what the payments would be until much later.

211.    Tanif was actually quite surprised that she was approved for the loan because she

12330

1   did not have a very good credit score at that time.  The fact that she was approved encouraged her

2   and made her think that Sallie Mae must have confidence in the CCA education.  This bolstered her

3   confidence that she would be able to repay the loan.  As Tanif understood things, a loan company

4   usually looks at your credit history in determining whether to loan you money.  Since she did not

5   have a good credit history, she assumed Sallie Mae had another reason for believing she would be

6   able to repay the loan; namely, that they believed a CCA graduate would make enough to make the

7   monthly loan payments manageable and reasonable.  Why else would they lend me thousands of

8   dollars so easily," Tanif thought at the time.

9       212.    Tanif thought that her expectations were reasonable based on CCA representations.

10  She believed that, with hard work and dedication, she would easily be able to work her way up to a

11  position of high responsibility and pay.  She also believed that Sallie Mae would work with her if

12  any unforeseen circumstances were to arise.  She based all of these conclusions on the

13  representations made to her by the CCA admissions and financial aid officers that guided her

14  through the application and financial aid process.

15              **ALLEGATIONS SPECIFIC TO PLAINTIFF ADAM CORRIVEAU**

16      213.    Adam Corriveau first contacted CCA in late 2003 or early 2004.  He wanted to get

17  into the culinary industry and had looked at the websites for three schools:  CCA, Culinary Institute

18  of America, and a culinary school in Boston.  Based on the representations made on CCA's

19  website, Adam decided that it was the most prestigious option.

20      214.    In early 2004 Adam lived in Massachusetts and could not easily visit CCA for a

21  campus tour.  Instead, he spoke to a CCA admissions and recruitment representative on the phone

22  regarding CCA's programs.  The CCA representative he spoke with informed him that CCA was

23  "the second-best culinary school in the country."  The CCA representative made several

24  representations to Adam that made him want to attend CCA.  For example, the officer told him that

25  he would have many career opportunities as a CCA graduate, such as working at a country club, in

26  a fancy restaurant, or on a cruise ship, and he then estimated how much money Adam might make

27  in these various different positions.  Adam does not recall the actual figures, but remembers being

28  assured that he would make good money as a CCA graduate.

12330

215.    The representative also told him CCA had wonderful resources with lots of high-class employers and that CCA could get him job placement very easily upon graduation.  He later found out this was not the case.  He remembers one job fair with poor opportunities but does not recall any resources being made available to him that would have helped him get a job making the kind of money he would need to repay his loans.

216.    Adam asked the representative he spoke to on the phone to send him an application. CCA then mailed him an application packet along with a CCA brochure that made similar representations as the admissions representative had made regarding his projected income opportunities.  After Adam completed and mailed in his application, he received a congratulatory call from another admissions representative telling him he was very lucky because he had been accepted into CCA's "exclusive" program.  The representative stressed that only a lucky few were admitted each year.

217.    CCA then sent Adam a financial aid brochure containing the Sallie Mae loan applications.  He filled these out and returned them, and then later learned he had been approved. CCA presented Sallie Mae as the appropriate lender and did not give him any other lender options. A financial aid officer went through the packet with him over the phone and told him that he would be making enough money upon graduation to make his loan payments reasonable.   Adam was later approved for a Sallie Mae loan "package."

218.    The time frame during which all of these calls and applications took place was in early to mid-2004.

219.    By July or August of 2004 Adam had been approved for his loan and moved his family to San Francisco.  Once he arrived he went to the CCA campus for a campus tour.  During the tour, an admissions representative made similar representations regarding his career opportunities and earning potential once he graduated.  Essentially, he kept hearing the same story from CCA:  once you graduate, you'll be trained for and able to get any number of different high-paying positions in the culinary industry.  Sadly, this simply was not true.

220.    Adam did not understand when he signed the loan paperwork that part of the money was federal and part of the package was a private loan.  If that had been explained to him, he

1   believes that would have raised red flags because when you borrow money to buy a house or a car,

2   you do not need multiple different kinds of loans.  He would have wanted more explanation of why

3   the federal money was not enough to cover the tuition.

4        221.    Adam believed that the monthly payments on his loans would be reasonable in light

5   of his career opportunities because he did not believe that Sallie Mae would give him a loan he

6   could not afford to repay.  Rather, he believed that *Sallie Mae* believed that it was giving him a fair

7   deal.  Adam never expected to be in the dire financial situation he now finds himself in, sinking

8   deeper and deeper into debt every month.  If he had realized that many CCA graduates cannot

9   repay their loans, or cannot repay them on time, he would never have signed up for the loans and

10  would not have attended CCA.

11       **ALLEGATIONS SPECIFIC TO PLAINTIFF JESELL GONZALES**

12       222.    Jesell first considered pursuing a degree at CCA in early to mid-2005.  She looked

13  over the information available on the CCA website and then filled out a web-form requesting

14  more information.  Shortly thereafter a CCA admissions office representative called Jesell and

15  set up an appointment for her to visit the school.

16       223.    In the summer of 2005, Jesell went to the CCA admissions office located on Polk

17  Street in San Francisco and there met with a female admissions officer who told her about the

18  various programs CCA had to offer.  While she was there, the admissions officer showed her

19  some brochures and a promotional video.  Jesell quickly focused on the longer Culinary Arts

20  Program, which came with a hefty price tag between $40,000 and $45,000.

21       224.    The admissions officer assured Jesell that she would have many different

22  opportunities as a graduate of the program, such as working in hotel management, on a cruise

23  ship, or as an executive chef in a high-end restaurant.  In retrospect, Jesell realizes that the fast-

24  paced pitch she received from the CCA representative was not accurate but rather sugar-coated

25  the truth:  most CCA graduates come out of the school only able to get work in the most bottom-

26  of-the-barrel positions, such as line-cooks or pantry-cooks—if they are lucky enough to find

27  work at all.

28

12330

225.   As part of the sales pitch, the CCA admissions officer told her that it would be "no problem" for her to get approved for student loans and that CCA would work with her if she got on board.  This was a large part of how the representative convinced Jesell to apply for the CCA program itself.  While the representative did not break down for her exactly what everything would cost and how Jesell could expect to pay for it, the representative repeatedly stressed that the cost of tuition was affordable and that she would have no trouble repaying the loans with the great jobs she would be able to get once she graduated.

226.   After the pitch, but while she was still at the admissions office, Jesell filled out an application for the school and a financial aid application.  The only loan applications she was provided were for Sallie Mae-issued loans.  She did not know that there were any other options.  She does remember the CCA representative briefly reviewing the terms of the loans, but the officer did not explain that the introductory interest rates would increase if she missed a payment or had to put her payments on hold.

227.   Shortly after this meeting, Jesell learned that she had been accepted to the Culinary Arts Program.  She also received notice in the mail that she had been approved for several loans including two High-Interest Private Loans from Sallie Mae.

228.   Jesell believed she would have no problem repaying her loans, and that the loan burden would be reasonable and manageable based on the CCA representative's representations that she would be easily able to find a high-paying and full-time job right after graduation.

## CLASS ACTION ALLEGATIONS

229.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3) on behalf of themselves and a Class of similarly situated persons defined as: All persons who took out a Sallie Mae private education loan for the purpose of financing training at the California Culinary Academy and who fall within the statutory limitations periods applicable to the herein-alleged causes of action (including, without limitation, the period following the filing of this action).

230.   There are not fewer than several thousand Class members.  Although more Class

12330

members resided in the San Francisco Bay Area than any other area when they received their High-Interest Private Loans and attended CCA, Class Members are now geographically dispersed throughout California and the rest of the United States.  Individual joinder of all members of the Class would be impracticable.

231.    Common questions of law or fact exist as to all members of the Class.  These questions predominate over the questions affecting only individual class members.  These common legal and factual questions include, among many others:

(a) Whether Sallie Mae misrepresented and/or failed to disclose relevant facts that were known to Sallie Mae and were material to the formation of the High-Interest Private Loans at issue;

(b) Whether Sallie Mae has been unjustly enriched in connection with these loans, through the collection of interest and fees, or otherwise.

(c) Whether the Notes are unenforceable due to Sallie Mae's misconduct alleged in this Complaint.

(d) Whether Sallie Mae's conduct complained of herein constitutes unlawful, unfair, deceptive, and/or fraudulent business practices, in violation of applicable consumer protection statutes.

(e) Whether CCA's Fraudulent Recruiting Program constitutes fraud;

(f) Whether Sallie Mae was complicit in and/or conspired with CCA in engaging in the Fraudulent Recruiting Program;

(g) Whether Sallie Mae's complicity in CCA's Fraudulent Recruiting Program is unlawful;

(h) The claims of named Plaintiffs Bradshaw, Stephenson, Corriveau, and Gonzales, who file this case for themselves individually and as representatives of the Class identified above, are typical of the claims of the Class.  The claims of all Class members depend upon a showing of the uniform acts and omissions of Defendants described herein giving rise to the rights of Plaintiffs to the relief sought.

232.    Plaintiffs Bradshaw, Stephenson, Corriveau, and Gonzales are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent.  They have retained counsel competent and experienced in conducting complex litigation, including complex class actions.  Plaintiffs and their counsel will

1 adequately protect the interests of the Class.

2      233.    Sallie Mae has acted or refused to act on grounds generally applicable to the Class,

3 thereby making appropriate Class-wide equitable relief.

4      234.    A class action is superior to other available methods for the fair and efficient

5 adjudication of the controversy, and will create a substantial benefit to both the public and the

6 courts in that: the costs of prosecuting the action individually will vastly exceed the costs for

7 prosecuting the case as a class action; class certification will obviate the necessity of a multiplicity

8 of claims; it is desirable to concentrate the litigation of these claims in this forum; and unification

9 of common questions of fact and law into a single proceeding before this Court will reduce the

10 likelihood of inconsistent rulings, opinions, and decisions.  Moreover, members of the Class almost

11 invariably lack the means to pay attorneys to prosecute their claims individually.  Given the

12 complexity of the issues presented here, individual claims are not sufficiently sizable to attract the

13 interest of highly able and dedicated attorneys who will prosecute such claims on a contingency

14 basis.

15      235.    By contrast, a class action presents far fewer management difficulties and provides

16 the benefits of single adjudication, economies of scale, and comprehensive supervision by a single

17 court.

18                         **CLAIMS FOR RELIEF**

19                      **FIRST CLAIM FOR RELIEF:**
20                      **FRAUDULENT CONCEALMENT**

21      236.    Plaintiffs hereby incorporate all preceding paragraphs of this Complaint and restate

22 them as if they were fully written herein.

23      237.    Sallie Mae brokered Plaintiffs and Class members into taking out the High-Interest

24 Private Loans without disclosing numerous material facts about which Sallie Mae had exclusive

25 knowledge in order to cause Plaintiffs and Class members to take out the High-Interest Private

26 Loans.  Sallie Mae omitted these material facts with the intent to deceive and/or induce reliance by

27 Plaintiffs and Class members.  Plaintiffs and Class members justifiably relied on these

28 misrepresentations, resulting in substantial damages to Plaintiffs and Class members.

238.    Sallie Mae omitted to disclose to Plaintiffs and Class members many material facts as alleged in this complaint, including the following:

(a) A degree from CCA did little, if anything, to aid graduates' chances of getting jobs in their field of interest at the income level necessary to justify the associated expense.

(b) CCA students have extremely high delinquency and default rates on their High-Interest Private Loans.

(c) CCA students have low post-graduate income levels that are not commensurate with either the cost of CCA tuition or with the students' private loan debt burden.

(d) CCA students' have low post-graduate employment rates.

(e) CCA's job placement resources are sub-par and much less successful than they had been prior to CEC's purchase of the company.

(f) In the 2000s, a CCA education was no longer worth what it had been a decade prior.

(g) CCA students have very little ability to repay their High-Interest Private Loans in full.

(h) When Sallie Mae extended the loans, it did so to artificially boost its own account books with evidence of many outstanding non-traditional High-Interest Private Loans.

(i) At the time that the loans were issued, Sallie Mae did not expect the Plaintiffs to be able to repay the loans in full.

(j) Sallie Mae disregarded its own underwriting standards when issuing the High-Interest Private Loans to the Plaintiffs and Class members.

(k) The debt-service burden to students upon graduation was unmanageable and unreasonable in light of the low-wage jobs that CCA graduates were qualified for and/or able to obtain.

(l) CCA students' private loan debt burden is unreasonably high in light of the paucity of job opportunities available to graduates.

239.    All of these facts are material because they bear on the financial soundness of the students' decision to attend CCA and to take out High-Interest Private Loans with Sallie Mae to finance this education.  Sallie Mae knew that the students would never have signed up to attend CCA or taken out the High-Interest Private Loans if these facts had been disclosed to them.

240.    Sallie Mae had a duty to disclose these facts—a duty that it violated.  Sallie Mae

had exclusive knowledge of these facts.  The basis for its knowledge, as alleged elsewhere, was two-fold: First, Sallie Mae worked hand-in-glove with CCA and CEC, as well as with prospective CCA students.  Sallie Mae had a substantial presence on the CCA campus.  It knew how CCA and CEC lured students to matriculate at the school, and it knew that the students relied on CCA's misrepresentations.  Second, Sallie Mae conducts substantial research and analyses into the graduation rates, the graduate employment statistics, and the loan repayment history for the students of the schools that its borrowers attend.  In fact, it used this information to determine the exorbitant interest rates it attached to the High-Interest Private Loans it extended to CCA students such as Plaintiffs.  For example, Sallie Mae was acutely aware, by the time Plaintiffs and Class members sought loans to attend CCA, that, that a significant percentage of CCA's students were unemployed or making very low wages, and that CCA students were unable to afford to repay fully the substantial High-Interest Private Loans.

241.    Sallie Mae furthermore knew that this information was not available to the Plaintiffs or Class members.

242.    Sallie Mae also misrepresented to the public that it had strict underwriting policies that controlled the extension of these loans.  As Sallie Mae exclusively knew, it had substantially loosened its underwriting standards for these loans and was issuing them indiscriminately to anyone that could "create condensation on a mirror."

243.    Sallie Mae omitted to disclose its knowledge of the objective facts regarding CCA's fraud; the true graduation, job placement, loan delinquency, and loan default rates for CCA students; and the truth regarding its own loosened underwriting standards when disclosing the terms and other pertinent facts regarding the loans to Plaintiffs and Class members.  Despite several opportunities to do so, Sallie Mae never disclosed the truth.

244.    Sallie Mae's herein-alleged acts and omissions, and each of them, were knowingly, willfully, intentionally, maliciously, oppressively, and fraudulently undertaken with the express purpose and intention of deceiving Plaintiffs and/or inducing Plaintiffs' reliance, and each of them, all to the substantial financial benefit of Sallie Mae.

245.    Sallie Mae's fraud garnered it significant economic advantages.  As discussed

1   above, when Sallie Mae knowingly, willfully, intentionally, and oppressively changed its policies

2   regarding the issuing of non-traditional High-Interest Private Loans to students, such as Plaintiffs

3   and Class members, attending certain for-profit schools such as CCA, it was attempting to bolster

4   its own profits.

5       246.    Plaintiffs and Class members were ignorant of the true facts omitted by Sallie Mae

6   and they justifiably relied upon these omissions in deciding to take out the High-Interest Private

7   Loans.  Plaintiffs believed Sallie Mae was a reputable company that would not extend loans it

8   never expected to be repaid.

9       247.    Although the High-Interest Private Loans state that the "lender" of the loans was a

10  different party, in fact Sallie Mae was the de facto lender and should be treated as the counterparty

11  to the contracts at the time of their formation.  Thus, there was a contractual relationship between

12  Sallie Mae and the Plaintiffs when they contemplated entering into—and ultimately did enter

13  into—the High-Interest Private Loan agreements.

14      248.    Plaintiffs and Class members were harmed by Sallie Mae's omissions of fact, in that

15  they took out substantial student loans to pay for their education, not knowing that the education

16  they were receiving in return was essentially valueless and would not provide sufficient economic

17  benefit to allow them to repay fully these loans.  They are now saddled with enormous debt and

18  sky-high interest and collection charges as a result of Sallie Mae's onerous loan terms.

19      249.    If not for Sallie Mae's fraudulent omissions and acts, Plaintiffs and class members

20  would not have attended CCA and would not have taken out High-Interest Private Loans to finance

21  such attendance.  They would furthermore not be struggling to deal with the mountain of debt from

22  the loans, their interest charges, and other associated costs.

23      250.    The harm that Plaintiffs have suffered and their damages was a direct, proximate,

24  and foreseeable result of Sallie Mae's concealment and misrepresentations.  Based on its own

25  research and analysis, Sallie Mae knew that the High-Interest Private Loans it issued to prospective

26  CCA students would be largely uncollectible and that the borrowers of these loans—such as

27  Plaintiffs—would face a lifetime of financial insecurity and debt as a consequence.  In light of this

28  knowledge, Sallie Mae hiked up its interest rates on these loans.

12330

251.    As a result of Sallie Mae's tortious conduct, Plaintiffs and Class members have been damaged in an amount that exceeds this Court's jurisdictional thresholds.

**SECOND CLAIM FOR RELIEF:**
**RESCISSION DUE TO UNILATERAL MISTAKE**

252.    Plaintiffs hereby incorporate all preceding paragraphs of this Complaint and restate them as if they were fully written herein.

253.    Plaintiffs and Class members were induced to enter into their Sallie Mae High-Interest Private Loans based on mistakes of fact caused by Sallie Mae's numerous non-disclosures of material fact and its inequitable conduct as alleged in this Complaint, including omissions regarding key facts material to their contracts of which Sallie Mae had exclusive knowledge.

254.    Although the High-Interest Private Loans state that the "lender" of the loans was a different party, in fact Sallie Mae was the de facto lender and should be treated as the counterparty to the contracts at the time of their formation.

255.    At the time that they entered into their High-Interest Private Loans, Plaintiffs and Class members were mistaken about numerous issues, including but not limited to those below, each of which, individually and/or collectively, warrants rescission of their High-Interest Private Loans:

(a) their likely ability to repay their High-Interest Private Loans in full;

(b) Sallie Mae's expectations about whether they would be able to repay the loans in full;

(c) whether the debt from their High-Interest Private Loan was reasonable and manageable in light of the income opportunities available to them upon graduating CCA;

(d) CCA's students' post-graduate delinquency rates and post-graduate default rates;

(e) CCA's students' post-graduate income levels, and whether they were commensurate with the loans necessary to pay for CCA's tuition; and

(f) CCA's students' post-graduate employment rate.

256.    These facts were material to the contracts, and Plaintiffs' and Class members mistakes thus went to the essence of their student loan contracts.  If not for these mistakes, among others detailed earlier in this Complaint, Plaintiffs and Class members would never have entered

12330

into the High-Interest Private Loans.

257.   Due to its close workings with CCA, CEC, and CCA students, as well as its internal monitoring of CCA (and its student-borrowers), Sallie Mae knew or should have known about CCA's Fraudulent Recruiting Program. Sallie Mae knew that Plaintiffs and Class members recruited to attend CCA were mistaken regarding the value of the education they were seeking to purchase, as well as their financial prospects after graduation, their ability to repay their Sallie Mae High-Interest Private Loans in full, and whether the resulting debt-service burden from these loans was reasonable and manageable in light of the income opportunities available to CCA graduates.

258.   Even if Sallie Mae did not know about the details of CCA's Fraudulent Recruiting Program, Sallie Mae knew that Plaintiffs and Class members are typically and predictably unable to repay their non-traditional High-Interest Private Loans. Sallie Mae knew that Plaintiffs and Class members' signing up for such loans was to the borrowers' detriment, setting them up for a lifetime of financial hardship, destroyed credit scores, and unmanageable burdens in the form of substantial interest payments and monthly payments and fees that would exceed their ability to repay. Sallie Mae furthermore knew that if these facts were known to the Plaintiffs and Class members, they would never have taken out the loans in the first place.

259.   At the time that Plaintiffs and Class members entered into their High-Interest Private Loans to attend CCA, Sallie Mae actively misled the public, including Plaintiffs and Class members, regarding the soundness of those loans and the students' ability to repay those loans in full. Sallie Mae claimed—during the years that Plaintiffs and Class members took out High-Interest Private Loans with Sallie Mae—that these loans were subject to strict underwriting and were expected to be repaid in full, just as any other Sallie Mae loan. However, Sallie Mae knew differently at the time: these students, often with poor credit, who attended a proprietary school that would not increase their earning potential, would have a relatively low likelihood of full repayment of the High-Interest Private Loans.

260.   There are a number of extraordinary factors that imposed upon Sallie Mae a greater responsibility for making full disclosures about the nature and terms of the High-Interest Private Loans. First, Sallie Mae was well aware the loan program was targeted at lower education, lower

12330

income, and vulnerable individuals, many of the only recent high school graduates.  Second, Sallie Mae used the CCA campus facilities and "financial aid" office to create the impression that these loans were part of an official government process, and were part of a responsible higher education program.   Third, Sallie Mae had exclusive possession of the facts regarding, among other facts detailed in this complaint, the high default rates and low repayment rates for the for-profit loans issued to CCA students, as well as CCA students' poor employment rates, the predictable relationship between the quality of the schools attended by students and the default rates, its practice of capitalizing interest on a regular basis to increase the loan principal, its patterns to use forbearance to hide the true problems in its loan portfolio, and the actual relaxed underwriting criteria it was employing.  Fourth, only Sallie Mae and CCA knew the terms of the preferred lending arrangement and recourse loan agreements that would have revealed the close relationship between CCA and Sallie Mae and reduced the business risk to Sallie Mae from making the High-Interest Private Loans.

261.   Despite its knowledge of the borrowers' mistakes of fact and its knowledge of the truth regarding the facts alleged in this Complaint, Sallie Mae neglected to disclose these relevant facts to Plaintiffs and other Class members.  Sallie Mae withheld facts it knew to be relevant, material, and mistaken by Plaintiffs and Class members; made affirmative misrepresentations of such relevant facts; peddled its own High-Interest Private Loans to Plaintiffs and Class members; and then allowed Plaintiffs and Class members to enter into its High-Interest Private Loans, notwithstanding Plaintiffs' and Class members' obvious mistakes of key facts.

262.   Plaintiffs and Class members thus entered into the loan agreements at issue based on unilateral mistakes of fact, procured by Sallie Mae's inequitable conduct of not disclosing key facts and itself misrepresenting key facts relevant to Plaintiffs' and Class members' mistakes.

263.   This inequitable conduct, even if made by Sallie Mae innocently and without intent to deceive, acted to create, reinforce, and/or not contradict Plaintiffs' and Class members' known mistakes of fact.  Plaintiffs and Class members need not, and do not, for this claim allege that Sallie Mae's conduct constitutes fraud.  Rather, Defendants' conduct is actionable, even without alleging for this claim maliciousness or intent to defraud.

264.    Plaintiffs acted on their mistakes of fact to their own detriment.  If not for those mistakes, procured by Sallie Mae's omission of relevant facts and affirmative misrepresentations of such facts, Plaintiffs and Class members would not have entered into their Sallie Mae High-Interest Private Loan contracts.

265.    As a result of Plaintiffs' unilateral mistakes of fact, the loan contracts were not entered into as a result of a true "meeting of the minds."

266.    Plaintiffs and Class members' mistakes were not the result of their own gross negligence.  Nor have they exhibited gross negligence in not sooner seeking rescission, as some of the operative facts, particularly regarding Sallie Mae's own knowledge, were not reasonably available until recently.

267.    Sallie Mae has gained an unconscionable advantage by virtue of Plaintiffs' and Class members' mistake.  Although these loans were improperly entered into based on Plaintiffs' unilateral mistakes of fact, procured by Sallie Mae's inequitable conduct, Sallie Mae has nevertheless benefitted substantially from the loans.   Enforcement of Plaintiffs' and Class members' High-Interest Private Loans would be unconscionable, and Plaintiffs and Class members should not bear the risk of their mistake.

268.    In addition to the business benefits Sallie Mae obtained by temporarily and artificially boosting its own profits by virtue of issuing High-Interest Private Loans to Plaintiffs and Class members, Sallie Mae also has obtained substantial payments from each of the Plaintiffs and Class members under the terms of the individual loans in the form of origination fees, interest payments, delinquency charges, and/or other payments and fees.

269.    Plaintiffs can and should, in equity, be returned to their status quo ante through rescission of the contracts.

270.    Due to the improperly entered student loan contracts, Plaintiffs and Class members have been damaged in a sum in excess of the jurisdictional limits of this Court.

## THIRD CLAIM FOR RELIEF:
## UNJUST ENRICHMENT

271.    Plaintiffs hereby the preceding paragraphs of this Complaint and restate them as if they were fully written herein.

12330

272.     Due to its close workings with CCA, CEC, and CCA students, as well as its internal monitoring of CCA (and its student-borrowers), Sallie Mae knew or should have known about CCA's Fraudulent Recruiting Program.  Sallie Mae knew or should have known that Plaintiffs and Class members recruited to attend CCA had been misled regarding the value of the education they were seeking to purchase, as well as their financial prospects after graduation, their ability to repay their Sallie Mae High-Interest Private Loans in full, and whether the resulting debt-service burden from these loans was reasonable and manageable in light of the income opportunities available to CCA graduates.

273.     Even if Sallie Mae did not know about the details of CCA's Fraudulent Recruiting Program, Sallie Mae knew that Plaintiffs and Class members are typically and predictably unable to repay their non-traditional High-Interest Private Loans.  Sallie Mae knew that Plaintiffs and Class members' signing up for such loans was to the borrowers' detriment, setting them up for a lifetime of financial hardship, destroyed credit scores, and unmanageable burdens in the form of substantial interest payments and monthly payments and fees that would exceed their ability to repay.  Sallie Mae furthermore knew or should have known that if these facts were known to the Plaintiffs and Class members, they would never have taken out the loans in the first place.

274.     At the time that Plaintiffs and Class members entered into their High-Interest Private Loans to attend CCA, Sallie Mae actively misled the public, including Plaintiffs and Class members, regarding the soundness of those loans and the students' ability to repay those loans in full.  Sallie Mae claimed—during the years that Plaintiffs and Class members took out High-Interest Private Loans with Sallie Mae—that these loans were subject to strict underwriting and were expected to be repaid in full, just as any other Sallie Mae loan.  However, Sallie Mae knew differently at the time: these students, often with poor credit, who attended a proprietary school that would not increase their earning potential, would have a relatively low likelihood of full repayment of the High-Interest Private Loans.

275.     Despite its knowledge of the borrowers' mistakes of fact and its knowledge of the truth regarding the facts alleged in this Complaint, Sallie Mae neglected to disclose these relevant facts to Plaintiffs and other Class members.  Sallie Mae thus withheld facts it knew to be relevant,

1  material, and mistaken by Plaintiffs and Class members; made affirmative misrepresentations of

2  such relevant facts; peddled its own High-Interest Private Loans to Plaintiffs and Class members;

3  and then allowed Plaintiffs and Class members to enter into its High-Interest Private Loans,

4  notwithstanding Plaintiffs' and Class members' obvious mistakes of key facts.

5      276.    As discussed elsewhere in this complaint, the special circumstances surrounding the

6  issuance of its High Interest Private Loans imposed duties of disclosure upon Sallie Mae that it did

7  not meet.

8      277.    Plaintiffs and Class members thus entered into the loan agreements at issue based on

9  unilateral mistakes of fact, procured by Sallie Mae's inequitable conduct of not disclosing key facts

10  and itself misrepresenting key facts relevant to Plaintiffs' and Class members' mistakes.

11      278.    This inequitable conduct, even if made by Sallie Mae innocently and without intent

12  to deceive, acted to create, reinforce, and/or not contradict Plaintiffs' and Class members' mistakes

13  of fact.

14      279.    Plaintiffs acted on their mistakes of fact to their own detriment.  If not for those

15  mistakes, procured by Sallie Mae's omission of relevant facts and affirmative misrepresentations of

16  such facts, Plaintiffs and Class members would not have entered into their Sallie Mae High-Interest

17  Private Loan contracts.

18      280.    As a result of Plaintiffs' unilateral mistakes of fact, the loan contracts were not

19  entered into as a result of a true "meeting of the minds."

20      281.    Although these loans were improperly entered into based on Plaintiffs' unilateral

21  mistakes of fact, procured by Sallie Mae's inequitable conduct, Sallie Mae has nevertheless

22  benefitted substantially from the loans at Plaintiffs' and Class members' expense.

23      282.    In addition to the business benefits Sallie Mae obtained by temporarily and

24  artificially boosting its own profits by virtue of issuing High-Interest Private Loans to Plaintiffs and

25  Class members, Sallie Mae also has obtained substantial payments from each of the Plaintiffs and

26  Class members under the terms of the individual loans in the form of origination fees, interest

27  payments, delinquency charges, and other payments and fees.

28      283.    Sallie Mae was aware of and appreciated these benefits.

284.   As described above, Sallie Mae obtained these benefits by way of unconscionable, improper, inequitable, and/or misleading conduct, including artifice, concealment, misrepresentation, and omission of key facts relevant to the formation of the High-Interest Private Loans.

285.   As the loans should never have been extended in the first place, Sallie Mae should not in equity and good conscience be permitted to retain the substantial interest, delinquency, and other payments it has charged to, and received from, Plaintiffs and Class members.   It would similarly be inequitable for Sallie Mae to be permitted to accept any such benefits from the High-Interest Private Loans in the future.

286.   Allowing Sallie Mae to accept and/or retain this money would amount to unjust enrichment.

287.   Plaintiffs and Class members lack an adequate remedy at law.

288.   Due to the interest payments and other fees provided to Sallie Mae by Plaintiffs and Class members on the improperly entered student loan contracts, Plaintiffs and Class members have been damaged in a sum that exceeds the jurisdictional limits of this Court.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE**
**SECTION 17200, *ET. SEQ.*  [UNFAIR COMPETITION LAW]**

289.   Plaintiffs hereby incorporate all preceding paragraphs of this Complaint and restate them as if they were fully written herein.

290.   The material misrepresentations and non-disclosures by Defendants are unlawful, unfair, and fraudulent business practices prohibited by California's Unfair Competition Law ("UCL").

291.   Defendants violated the UCL through the affirmative misrepresentations and omission of relevant facts detailed in the complaint, which were known to Defendants at the time that Plaintiffs and Class members took out their High-Interest Private Loans, such as the fact that Sallie Mae had changed its underwriting program and knew that a relatively large percentage of Plaintiffs and Class members would not be able to repay their loans.  Due to the misrepresentations and omissions detailed in this Complaint, Sallie Mae deceived Plaintiffs and Class members to

12330

1   their detriment.

2         292.    Sallie Mae had exclusive possession of material facts that were not know to the

3   Plaintiffs and the Class members.  It had a duty to disclose such facts, but it nevertheless did not

4   disclose such facts.

5         293.    Defendants violated the UCL by engaging in unlawful, unfair, and fraudulent

6   business acts and practices through their conduct that aided and abetted CCA's fraud, as set forth

7   more fully above.

8         294.    Defendants' acts or practices were deceptive, sharp, immoral, unethical, oppressive,

9   unscrupulous, substantially injurious, and operated to the competitive disadvantage of other lenders

10  that did not engage in such practices.

11        295.    The injury to Plaintiffs and Class members, all of whom resided in California to

12  attend CCA, was substantial, outweighed the utility of Defendants' practices, and could not have

13  been reasonably avoided by Plaintiffs and Class members.  These practices were likely to

14  deceive—and in fact, did deceive—members of the public, such as Plaintiffs and Class members.

15  Consequently, Defendants' fraudulent conduct, withholding material facts regarding the High-

16  Interest Private Loans, making affirmative misrepresentations regarding those loans, and extending

17  loans in violation of Sallie Mae's own underwriting policies to students that Sallie Mae did not

18  reasonably expect to ever be able to repay the loans constitute unfair, fraudulent, and unlawful

19  business acts and/or practices within the meaning of the UCL.

20        296.    Defendants carried out this unlawful, deceptive, fraudulent, and unfair conduct in

21  the course of business.

22        297.    Pursuant to California Business and Professions Code Section 17204, an action for

23  unfair competition may be brought by any "person. . . who has suffered injury in fact and has lost

24  money or property as a result of such unfair competition."  Defendants' unlawful, fraudulent, and

25  unfair business practices have actually, directly, and seriously injured Plaintiffs, and each of them,

26  by causing them to purchase and pay for a CCA education that is of no value or of far less value

27  than represented, and to enter mistakenly and unjustly into agreements for loans.  The Plaintiffs all

28  suffered injury in fact because, but for Defendants' unlawful, fraudulent, and unfair competition,

1  Plaintiffs and Class members would not have enrolled in CCA, paid the tuition and fees, and taken

2  out High-Interest Private Loans to finance their CCA education. Plaintiffs and Class members

3  have lost significant sums of money—often tens of thousands of dollars each—because of

4  Defendants' unlawful, fraudulent, and unfair competition.

     298.    Pursuant to the UCL, Plaintiffs and Class members are entitled to restitution of all

monies they paid to Defendants, including loan payments, interest payments, and fees.

     299.    As a result of Sallie Mae's above-referenced conduct, Plaintiffs and Class members

have been damaged in an amount that exceeds this Court's jurisdictional threshold.

**FIFTH CLAIM FOR RELIEF:**
**VIOLATION OF OKLAHOMA'S CONSUMER PROTECTION ACT**
**OKLAHOMA STATUTES, TITLE 15, SECTION 751, *ET. SEQ.***

     300.    Plaintiffs hereby incorporate all preceding paragraphs of this Complaint and restate

them as if they were fully written herein.

     301.    Defendants engaged in unfair and deceptive trade practices that are unlawful under

the Oklahoma Consumer Protection Act ("OCPA") through its conduct that aided and abetted

CCA's fraud, as set forth above. This conduct was carried out in the course of Sallie Mae's

business. These practices deceived and/or could reasonably have been expected to deceive or

mislead consumers to their detriment—and in fact, did deceive and mislead Plaintiffs and Class

members. These practices offend public policy, and moreover were immoral, unethical,

oppressive, unscrupulous, and substantially injurious to consumers.

     302.    Defendants also engaged in unfair and deceptive trade practices that are unlawful

under the OCPA through affirmative misrepresentations and omission of relevant facts detailed in

this complaint, which were known to Defendants at the time that Plaintiffs and Class members took

out their High-Interest Private Loans, such as the fact that Sallie Mae had changed its underwriting

program and knew that a relatively large percentage of Plaintiffs and Class members would not be

able to repay their loans. Due to the misrepresentations and omissions detailed in this Complaint,

Sallie Mae deceived Plaintiffs and Class members to their detriment.

     303.    Defendants' misrepresentations and omissions, in pursuit of their own substantial

profit and to the extreme detriment and expense of Plaintiffs and Class members, with little or no

12330

1  regard for how this conduct would ruin these students' financial security and future, offends

2  established public policy.  Defendants' conduct is also immoral, unethical, oppressive,

3  unscrupulous, and substantially injurious to consumers.

4      304.   Defendants carried out this unlawful, deceptive, and unfair conduct in the course of

5  business.

6      305.   Defendants' unlawful, deceptive, and unfair business practices have actually,

7  directly, and seriously injured the consumer Plaintiffs and Class members, and each of them, by

8  causing them to purchase and pay for a CCA education that is of no value or of far less value than

9  represented, and to enter into agreements for loans that were not competitively priced.  The

10  consumer Plaintiffs and Class members all suffered injury in fact because, but for Defendants'

11  unlawful, deceptive, and unfair trade practices, Plaintiffs and Class members would not have

12  enrolled in CCA, paid the tuition and fees, and taken out High-Interest Private Loans to finance

13  their CCA education.  Plaintiffs and Class members have each lost tens of thousands of dollars

14  because of Defendants' unlawful, deceptive, and unfair business practices.

15      306.   The special circumstances surrounding the issuance of these loans, as alleged

16  elsewhere in this complaint, imposed duties of disclosure upon Sallie Mae that it did not meet.

17      307.   Defendants' conduct was unconscionable within the meaning of the OCPA because,

18  among other reasons detailed in this Complaint, Defendants knew or had reason to know, at the

19  time the loans were entered into, that there was a relatively low probability of payment of the

20  obligation in full by the consumer Plaintiffs and Class members.  Defendants' conduct was

21  furthermore unconscionable because they knew or had reason to know that the transaction they

22  induced the consumer Plaintiffs and Class members to enter into was excessively one-sided in

23  favor of Defendants.

24      308.   Based on these facts, the High-Interest Private Loan contracts violate Oklahoma's

25  Consumer Protection Act.

26      309.   Pursuant to the OCPA, Plaintiffs and Class members are entitled to damages,

27  rescission of the contracts, and civil penalties due to the unconscionable, unlawful, deceptive, and

28  unfair practices at issue.

310.     As a result of Sallie Mae's above-referenced conduct, Plaintiffs and Class members have been damaged in an amount that exceeds this Court's jurisdictional threshold.

## SIXTH CLAIM FOR RELIEF:
## NEGLIGENCE

311.     Plaintiffs hereby incorporate all preceding paragraphs of this Complaint and restate them as if they were fully written herein.

312.     In acting as CCA's "preferred lender," Sallie Mae exceeded the scope of a conventional role as a mere lender of money.  Rather, Sallie Mae, by participating in and enabling CCA's fraudulent scheme, took on a role as an active participant in CEC and CCA's scheme to defraud its students.  Its role was necessary to perpetuate CCA's fraudulent scheme.

313.     For the reasons stated above, Sallie Mae had a duty to disclose all material aspects of its High Interest Private Loans to Plaintiffs and Class members.

314.     As discussed above, Sallie Mae breached that duty.  Its breach was the direct and proximate cause of Plaintiffs' and Class members' injuries, as detailed in this complaint.

315.     The preferred lender and loan recourse arrangement between Sallie Mae, CCA, and CEC was expressly intended to affect the Plaintiffs.  Indeed, the gist of the preferred lender agreement was that CCA and CEC employees would pressure prospective CCA students into taking out High-Interest Private Loans from Sallie Mae, thereby saddling them with Sallie Mae's burdensome loan terms.  Furthermore, these agreements were made to facilitate and enable the success of CCA's fraudulent recruiting scheme.

316.     As described above, Sallie Mae knew, or should of known, of CCA's policy of misrepresentations, and knew that the loans it was providing to CCA's students were "predictably not collectable."  Participating in this scheme as CCA's "preferred lender" was intended to affect Plaintiff and CCA's students.

317.     The harm from this arrangement was patently foreseeable to Sallie Mae.  It knew, based on its own independent research and analysis, that a CCA education was essentially worthless—or at least worth far less than it cost—and that the students would not be able to finance

12330

1   this worthless education if Sallie Mae did not finance their tuition through its High-Interest Private

2   Loans.  It was also foreseeable that the debt burden on these loans would exceed the Plaintiffs'

3   ability to repay.  Sallie Mae knew that CCA students had low job-placement rates, in addition to

4   extremely high delinquency and default rates.  Only Sallie Mae and its partner CCA knew the

5   terms of the preferred lending arrangement and recourse loan agreements that would have revealed

6   the close relationship between CCA and Sallie Mae and reduced the business risk to Sallie Mae

7   from making the High-Interest Private Loans.  Moreover, Sallie Mae had exclusive possession of

8   the facts regarding its awareness of the high default rates for the for-profit loan portfolio, its

9   practice of capitalizing interest on a regular basis to increase the loan principal, its patterns to use

10  forbearance to hide the true problems in its loan portfolio, and the actual relaxed underwriting

11  criteria it was employing.  In fact, Sallie Mae admitted that such loans were "predictably not

12  collectable."

13       318.    Sallie Mae's conduct in extending these loans is extremely closely connected to the

14  Plaintiffs' damages.  Plaintiffs were damaged because Sallie Mae extended to them its High

15  Interest Private Loans.  Sallie Mae's financing enabled CCA's Fraudulent Recruiting Scheme to

16  work.  Without the easy access to loans and seamless process whereby CCA was able to tout Sallie

17  Mae as a preferred lender and dupe its prospective students into signing up for these exorbitant

18  loans, CCA's scheme would have failed.  If Sallie Mae had exercised reasonable care in the

19  exercise of this power, it would have discovered that the education provided would not enable the

20  students to repay their loans and would have withheld financing.

21       319.    In fact, Sallie Mae did conduct independent research and discovered the ability of

22  CCA students to repay their loans was extremely low; it hiked up its own interest rates in

23  recognition of this fact.  Thus, Sallie Mae failed its obligation to its own shareholders when it

24  failed to exercise reasonable care to preclude the issuance of loans that were predictably not

25  collectable.  If not for the extension of Sallie Mae's High-Interest Private Loans in direct

26  contravention of its own expressed underwriting standards, and if not for Sallie Mae's fraudulent

27  concealment of material facts, CCA's Fraudulent Recruiting Scheme would have failed, Plaintiffs

28  would not have taken out the High-Interest Private Loans, and Plaintiffs would not now be futilely

71

Second Amended Complaint

1    struggling to meet their loan repayment terms.

2        320.   These practices deceived and/or could reasonably have been expected to deceive or

3    mislead consumers to their detriment—and in fact, did deceive and mislead Plaintiffs and Class

4    members.  These practices offend public policy, and moreover were immoral, unethical,

5    oppressive, unscrupulous, and substantially injurious to Plaintiffs and Class members.

6        321.   Sallie Mae's moral blame in extending these loans is phenomenal.  Together with

7    CCA, Sallie Mae perpetrated this scheme by intentionally targeting lower education, lower income,

8    and vulnerable individuals, many of them only recent high school graduates.  Sallie Mae also used

9    the CCA campus facilities and "financial aid" office to create the impression that these loans were

10   part of an official government process, and were an aspect of a responsible higher education

11   program.  Quite simply, Sallie Mae knew prospective CCA students were generally ill-equipped to

12   discern the fraudulent nature of the CCA's recruiting program and were not privy to true

13   information regarding the loans they were taking out, the education they were purchasing, and

14   former CCA students' delinquency or default rates.

15       322.   Defendants' misrepresentations and omissions, in pursuit of their own substantial

16   profit and to the extreme detriment and expense of Plaintiffs and Class members—with little or no

17   regard for how this conduct would ruin these students' financial security and future—offends

18   established public policy.  Defendants' conduct is also immoral, unethical, oppressive,

19   unscrupulous, and substantially injurious to consumers.

20       323.   Extending a duty in this situation would promote a policy of preventing future harm.

21   Rules that tend to discourage misconduct are particularly appropriate when applied to an

22   established industry, such as the student loan business.

23       324.   Defendants' conduct complained of in this case has actually, directly, and seriously

24   injured the consumer Plaintiffs and Class members, and each of them.  But for Defendants' role in

25   the scheme, Plaintiffs and Class members would not have enrolled in CCA, paid the tuition and

26   fees, and taken out High-Interest Private Loans to finance their CCA education.  Plaintiffs and

27   Class members have each lost tens of thousands of dollars because of Defendants' actions.

28       325.   Plaintiffs and Class members are entitled to damages.

12330

326.    As a result of Sallie Mae's above-referenced conduct, Plaintiffs and Class members have been damaged in an amount that exceeds this Court's jurisdictional threshold.

## PRAYER FOR RELIEF

327.    WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class, request relief and awards as follows:

A.  A declaratory judgment that Defendants' conduct complained of herein is illegal.

B.  An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives for the Class, and Plaintiffs' counsel be appointed Class Counsel.

C.  Rescission of the High-Interest Private Loan contracts taken out by Plaintiffs and Class members for the purpose of financing their CCA tuition and related expenses.

D.  An order requiring Defendants to disgorge all profits that have unjustly enriched Defendants in connection with the improperly entered contracts.

E.  Compensatory and other damages against Defendants.

F.  Punitive damages against Defendants permitted by law.

G.  Civil penalties against Defendants permitted by law.

H.  Restitution permitted by law.

I.  An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendants as a result of the unlawful, fraudulent, deceptive, and unjust conduct alleged herein.

J.  Pre-judgment and post-judgment interest permitted by law.

K.  An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees.

L.  Such other and further relief as may be deemed necessary or appropriate.


Respectfully submitted,

       /s/ Christopher D. Sullivan
        Christopher D. Sullivan
        Attorneys for Plaintiffs

12330

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all causes of action and/or issues so triable.

Dated:  November 15, 2013          Respectfully submitted,

GREENFIELD SULLIVAN DRAA
& HARRINGTON LLP

      */s/ Christopher D. Sullivan*
Christopher D. Sullivan
Attorneys for Plaintiffs

74

12330